[900 NE2d 924, 872 NYS2d 373]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JASON
NARADZAY, Appellant.

Argued October 15, 2008; decided November 24, 2008

## POINTS OF COUNSEL

*Stewart F. Hancock, Jr.,* Syracuse, and *Hiscock Legal Aid Society* (*Gerald T. Barth* of counsel) for appellant. I. Defendant's convictions for attempted murder in the second degree should be reversed and those charges dismissed because there is insufficient proof, as a matter of law, that defendant—"with intent to commit" (Penal Law § 110.00) the crimes—engaged in conduct which tended "to effect commission of such" (*id.*) crimes. (*People v Kassebaum,* 95 NY2d 611; *People v Trepanier,* 84 AD2d 374; *Feldman v Citibank,* 110 Misc 2d 838; *People v Bracey,* 41 NY2d 296; *People v Collins,* 234 NY 355; *People v Chandler,* 250 AD2d 410; *People v Mendez,* 197 AD2d 485; *People v Acosta,* 80 NY2d 665; *People v Mahboubian,* 74 NY2d 174; *United States v Desena,* 287 F3d 170.) II. Defendant's conviction for attempted burglary in the first degree should be reversed and that charge dismissed because there is insufficient proof, as a matter of law, that defendant—"with intent to commit" (Penal Law § 110.00) the crime—engaged in conduct which tended "to effect the commission of such crime" (*id.*) III. The trial court committed two reversible errors in denying defendant's suppression motions: first, in not suppressing certain of defendant's un-Mirandized statements made in custodial interrogation at the scene; and second, in using these un-Mirandized statements to create probable cause for defendant's arrest, thus making the search of defendant's person which produced the "to-do list" a search incident to a lawful arrest. (*People v Huffman,* 41 NY2d 29; *People v Stroman,* 118 AD2d 1006, 68 NY2d 672; *People v Rosen,* 112 AD2d 253; *People v O'Connor,* 6 AD3d

738; *People v Crowley,* 98 AD2d 628; *People v Bastian,* 294 AD2d 882.) IV. The court's errors in denying suppression of the un-Mirandized statements and the "to-do list" taken in an illegal search require a reversal and a grant of a new trial on all of defendant's convictions.

*William J. Fitzpatrick, District Attorney,* Syracuse (*Victoria M. White* and *James P. Maxwell* of counsel), for respondent. I. Defendant came dangerously close to bursting into the G. home and shooting his intended targets. (*People v Gaimari,* 176 NY 84; *People v Villante,* 204 AD2d 369, 84 NY2d 834; *People v Garafolo,* 44 AD2d 86; *People v Williams,* 84 NY2d 925; *People v Thompson,* 72 NY2d 410; *People v Ford,* 66 NY2d 428; *People v Contes,* 60 NY2d 620; *People v Padilla,* 181 AD2d 1051; *People v Badia-Almonte,* 161 AD2d 1199; *People v Allen,* 9 NY3d 1013; *People v Rizzo,* 246 NY 334.) II. The hearing court's findings of fact and denial of suppression are supported by the hearing record. (*People v Prochilo,* 41 NY2d 759; *People v Stokes,* 212 AD2d 986, 86 NY2d 741; *People v Williams,* 202 AD2d 976, 83 NY2d 916; *People v McLee,* 249 AD2d 995, 92 NY2d 901; *People v Allen,* 9 NY3d 1013; *People v Huffman,* 41 NY2d 29; *People v Bennett,* 70 NY2d 891; *People v Madore,* 289 AD2d 986, 97 NY2d 757; *People v Bigelow,* 66 NY2d 417; *People v Weintraub,* 35 NY2d 351.)

### OPINION OF THE COURT

READ, J.

In late winter or early spring of 2003, D.G. was introduced to defendant Jason Naradzay by a mutual friend while on an out-of-town visit to a resort in the Thousand Islands with two of her girlfriends. D.G. and defendant occasionally talked with and met each other in the ensuing months. In particular, defendant sought D.G.'s assistance in polishing his resumé and making contacts in the Syracuse area, where he planned to relocate.

According to D.G., by August 2003 she had decided to sever ties with defendant because he was "appearing just a bit too needy and troublesome . . . in his behavior." She claims that she told defendant not to call her again, but he did, and she would relent and talk to him as "a listening ear." She also encountered defendant in public more often than the odds of a chance meeting would seem to make plausible; for example, he turned up unexpectedly at a party that D.G. hosted for friends at an out-of-town restaurant near her summer home, and at her daughter's soccer game at the Carrier Dome. On February 3,

2004, defendant called D.G., angrily complaining that she no longer made time for him. She responded that he was "now not giving [her] any choice" about continuing their friendship; she instructed him not to call her again. Defendant, for his part, denies that D.G. ever asked him to stop calling her.

Defendant acknowledges, however, that on or about February 4, 2004 he put together a "to-do" list memorializing a plan to break into D.G.'s home and to shoot D.G. and her husband in front of their three children. The list consisted of eight individually numbered steps; specifically, (1) "pick up 7:00," (2) "travel 7:30," (3) "arrive and park and load," (4) "corner of property," (5) "power enter (door knob + run + seek)," (6) "ID" (written above the crossed-out phrase "seek out") 1, 2 and 3 (possibly a reference to D.G.'s three children) as well as the words "head, knees, back, hands," (7) "make children look" and "living room," and (8) "final shot!" Below this last item on the list, defendant wrote, among other things, "security," "chest shots," "children," the names of D.G. and her husband, and various body parts. He linked D.G.'s name to "right foot" and "hands"; he linked her husband's name to "knees" and "back."

On February 4, 2004, defendant responded to a newspaper advertisement offering a Remington 20-gauge shotgun for sale. After having first asked the seller to deliver the gun to him on February 6th, defendant called him back to move their appointment up one day, to February 5th. Defendant also called a friend to confirm that she would, as previously arranged, be staying overnight at his Syracuse apartment on February 5th and that he could borrow her vehicle that evening, which defendant falsely told her he needed "to run some errands and . . . meet a friend for coffee." Defendant concedes that he advanced his purchase of the shotgun by one day so as to have it available when he had access to the borrowed vehicle, enabling him to carry out the plan he had "concocted."

The friend arrived at defendant's apartment around 6:40 P.M. on February 5, 2004; the seller of the shotgun, a little later. Defendant lied to the seller that he was buying the shotgun as a gift for his father for skeet shooting, and that "since his father was an elderly gentleman [he] needed something with less of a kick to it." Defendant wrote the seller a check in the amount of $575 (which the seller tried unsuccessfully to cash the next day) for the shotgun, 25 sabot slugs and a green safety key to lock the trigger. The seller described the shotgun as having a "fully

rifled barrel that shoots only Sabot[1] slugs," and as "real accurate . . . zeroed for a hundred yards."

Defendant then left his apartment at 7:10 P.M., again telling his friend that he needed to borrow her car to run errands and meet someone for coffee. Five minutes later, he returned to ask his friend about the key to the vehicle, because he had been unable to get the door to open. When she "asked him if he would like [her] to come down, maybe the lock had frozen," he was "adamant about no, no no, it's okay, I'll get it and then he left."

About an hour later, at approximately 8:15 P.M., defendant again returned to his apartment. This time, he lied to his friend "that he had forgotten a library book that he had to return." He "walked past [her] to the bookshelf and grabbed a book," and she saw what "looked like a blanket or something wadded up under his left arm" as he left. Armed with the shotgun, defendant drove from Syracuse to Geddes, where D.G. and her family lived in a house on Cherry Road, at the junction of Cherry and Salisbury Roads.

Unsure of the exact location of D.G.'s house, defendant parked on Cherry Road south of her address and loaded the shotgun with four slugs—three in the magazine and one in the chamber. He got out of the vehicle with the shotgun in hand. As he walked north along Cherry Road, he concealed the shotgun inside his coat because "a thought came into [his] mind," that he did not want to be seen with it. As defendant rounded the corner onto Salisbury Road, he realized that "power entry" was the next step on his "to-do" list. His idea was to "kick down the door." According to defendant, he began to wonder if he could do that, but he "couldn't go home." He turned into a driveway on Salisbury Road. Defendant testified that he thought about shooting himself with the shotgun, and "it was the grace of God that [he] didn't commit suicide or what [he] had planned."

Between 9:00 P.M. and 9:30 P.M., a motorist pulled into the driveway of her 85-year-old mother's house on Salisbury Road after a day of shopping and visiting.[2] She "looked around the neighborhood and . . . saw a man walking up Salisbury Road and . . . made a mental note of it because two ladies going into

---

**1.** A sabot is a thrust-transmitting sheathing that positions a slug in the gun's barrel and prevents the escape of gas ahead of the slug, thereby improving accuracy (see Merriam-Webster's Collegiate Dictionary 1028 [10th ed 1996]).

**2.** In an affidavit executed the night of the incident, the motorist said that she arrived at her mother's house "at about 9:20 p.m."

the house in the dark is scary." As she went around to the back of her car to remove some packages, she saw defendant cross over to the side of Salisbury Road where her mother's house was located, and walk "down the driveway of [her] mother's elderly neighbor." She noticed him "scurr[ying] down the driveway," which "caught [her] attention again for [her] mother's and [her] safety." She then saw defendant pull a shotgun from beneath his coat. He leaned the shotgun against the neighbor's house and stood behind some tall shrubbery, seemingly trying to hide from her. Alarmed, the motorist "closed the back door of [her] car, got in the front door of [her] car, [and] told her mother [they] weren't going home right away." The motorist then drove the six blocks to her own house and immediately called 911.

The first deputy to respond to the motorist's 911 call testified that he received the dispatch informing him of a "[s]uspicious person with a rifle or a weapon" at 9:30 P.M. He arrived at the scene within minutes, driving his patrol car down Salisbury Road in a westerly direction (towards Cherry Road) with his headlights off. He observed defendant standing on the north shoulder of Salisbury Road, just east of the driveway on D.G.'s property. The area was illuminated by a street light. Defendant approached the patrol car, and the deputy asked him if he was the complainant. Defendant responded, "I'm not the complainant, but I have a complaint to report. I have mental problems."

The deputy got out of his patrol car and asked defendant if he had any weapons. Defendant pointed towards a shotgun placed next to a snowbank, about 20 feet from D.G.'s house and closer to the driveway where her van and two other cars were parked. The snowbank was on the shoulder of the road, abutting a wooden fence on D.G.'s property. After defendant admitted that the shotgun was loaded, the deputy placed him in handcuffs. A second sheriff's deputy soon arrived, and secured the loaded shotgun. This deputy testified that he received the dispatch at 9:30 or 9:35 P.M. and was at the scene within three minutes.

The two deputies were soon joined by two town police officers who assisted with frisking and questioning defendant. When asked what he was doing in the area, defendant responded by saying, "[T]hat bitch ruined my life." When asked whom he was referring to, defendant named D.G. and provided her address. Meanwhile, one of the deputies retrieved 21 sabot slugs and the green safety key from defendant's coat pockets. One of the police officers found a folded piece of paper in the pocket of

defendant's suit jacket. In response to the officer's question, defendant identified the paper as a "to-do" list.

A grand jury indicted defendant for attempted murder in the second degree, attempted burglary in the first degree and criminal possession of a weapon in the fourth degree. Following a hearing at which Supreme Court denied defendant's motion to suppress the "to-do" list and certain of his statements to police, the case proceeded to trial. At trial, defendant, who has been diagnosed with bipolar disorder, contended that he was not responsible for his acts by reason of mental disease or defect. He also protested at trial that he "[n]ever wanted to take a life," while acknowledging that he intended to open fire on D.G. and her husband with a shotgun in the confines of their home.

The jury convicted defendant of all charges. The trial judge, taking into account defendant's history of mental illness, sentenced him to concurrent terms aggregating 15 years' imprisonment plus five years of postrelease supervision. The Appellate Division subsequently affirmed, with one Justice dissenting, who granted defendant leave to appeal (50 AD3d 1489 [2008]). We now affirm.

■ Defendant primarily challenges the legal sufficiency of the proof supporting his attempted burglary and murder convictions, arguing that his intent was equivocal and that his actions prior to the arrival of the first deputy did not come "dangerously near" commission of burglary and murder. Viewing the evidence in the light most favorable to the People (*see People v Danielson*, 9 NY3d 342, 349 [2007]), we disagree.

A defendant is guilty of attempt "when, with intent to commit a crime, he [or she] engages in conduct which tends to effect the commission of such crime" (Penal Law § 110.00). In order to constitute an attempt, the defendant's "conduct must have passed the stage of mere intent or mere preparation to commit a crime" (*People v Mahboubian*, 74 NY2d 174, 189 [1989]). In other words, the defendant must have "engaged in conduct that came 'dangerously near' commission of the completed crime" (*People v Kassebaum*, 95 NY2d 611, 618 [2001], quoting *People v Acosta*, 80 NY2d 665, 670 [1993]). The "dangerously near" standard does not, however, mandate that the defendant take "the final step necessary" to complete the offense (*Mahboubian*, 74 NY2d at 190; *see People v Bracey*, 41 NY2d 296, 300 [1977]).

Defendant contends that his intent wavered on the night of his arrest, as evidenced by his thoughts of suicide and his place-

ment of the shotgun on the shoulder of the road next to the snowbank. A rational jury could reasonably infer, however, that defendant intended to commit burglary and murder from his "conduct and the surrounding circumstances" (*Bracey*, 41 NY2d at 301 [internal quotation marks and citation omitted]). On the evening of his arrest, in accordance with his "to-do" list, defendant borrowed a vehicle, obtained a shotgun and ammunition and drove several miles to the immediate vicinity of D.G.'s house. There was evidence that, in the few minutes that elapsed between the motorist's 911 call and the arrival of the first deputy, defendant emerged from the shrubbery beside a house on Salisbury Road and brought his loaded shotgun within 20 feet of D.G.'s house. Although, after the fact, defendant claimed that his plan evolved from murder (or murder-suicide) to suicide only, the jury was entitled to discredit that self-serving testimony.

Defendant also argues that his conduct never came "dangerously near" burglary and murder. He emphasizes that the first deputy on the scene found him "just standing" in the street and that he had not yet picked up the shotgun, walked onto D.G.'s property or tried to enter her home. But a rational jury could conclude that defendant crossed "the boundary where preparation ripens into punishable conduct," a determination that "depends greatly on the facts of the particular case" (*Mahboubian*, 74 NY2d at 190). Defendant's actions can be characterized as "potentially and immediately dangerous" (*id.* at 191): he filled his pockets with 25 sabot slugs, loaded a shotgun capable of hitting a target accurately at a distance of 100 yards with four of these slugs, including one in the chamber, and stood mere steps away from the property of his intended victims, thereby "placing it in [his] power to commit the offense unless interrupted" (*id.* [internal quotation marks and citation omitted]).

As we have "explicitly recognized" in previous decisions, "there comes a point where it is 'too late in the *stage of preparation* for the law to conclude that no attempt occurred' " (*id.* at 192, quoting *People v Miranda*, 23 NY2d 439, 446 [1969]). Although defendant seemed to claim that he put the shotgun aside and "meander[ed]" in the cold aimlessly for half an hour before the first deputy arrived, this is inconsistent with the motorist's and the deputies' testimony. They indicated that much less than half an hour elapsed between the time the motorist first spotted defendant propping the shotgun up against her mother's

neighbor's house and the first deputy's arrival on the scene. There was evidence that defendant moved the shotgun closer to D.G.'s house—placing it on the shoulder of the road bordering her property—during this interval. In short, the jury might have reasonably concluded that there was no homicide here only because an observant motorist made a 911 call and law enforcement authorities responded promptly, cornering defendant before he could burst into D.G.'s house, armed with a shotgun, the next step on his "to-do" list.

■ Finally, we reject defendant's argument that certain evidence was obtained in violation of his *Miranda* rights and should have been suppressed. Whether the police have engaged in custodial interrogation is a mixed question of law and fact (*see People v Paulman*, 5 NY3d 122, 129 [2005]). Here, record evidence supports the Appellate Division's conclusion that the police engaged in threshold questioning designed to clarify the situation—not interrogation—while frisking defendant.

Accordingly, the order of the Appellate Division should be affirmed.

JONES, J. (dissenting in part). I join the majority insofar as affirming the conviction for criminal possession of a weapon in the fourth degree. However, because the conduct of defendant did not, in my view, reach the point at which it would be punishable under the law of attempt, I respectfully dissent. As the majority correctly notes, to be guilty of attempted commission of a crime, a defendant must have (1) the specific intent to commit a crime and (2) conduct which comes "dangerously close" to the accomplishment of the crime—mere preparation is not enough (*see People v Bracey*, 41 NY2d 296, 300 [1977]). These requirements correspond to the mens rea and actus reus elements, both of which need to be established in order for a defendant to be guilty of attempt.

Here, there is no question that defendant's meticulous planning, post-arrest statements, and "to-do" list showed his intent to commit the crime of murder. However, intent by itself—no matter how loathsome—is not sufficient to establish criminal liability for attempt. As the dissent below aptly noted, "[t]he law does not punish evil thoughts" (50 AD3d 1489, 1492 [2008], quoting *People v Bracey*, 41 NY2d at 300, citing *People v Sullivan*, 173 NY 122, 133 [1903]). Even preliminary steps taken in furtherance of a criminal scheme, coupled with the requisite intent, would not constitute an attempt if those steps did not

come dangerously near completion of the crime (*see e.g. People v Rizzo*, 246 NY 334, 339 [1927]; *People v Sullivan*, 173 NY at 135-136).

As for the necessary actus reus element in this case, defendant merely carried out the initial steps in his "to-do" list and was never "dangerously near" completion of the crime. The evidence showed that at the time defendant approached the police admitting his mental problems and his possession of a shotgun, he was 25 to 30 feet from the border of the victims' property and his weapon was 5 to 10 feet away from him. Defendant never approached the house—no footprints were found in the snowy lawn—and never saw or came close to his intended victims—in fact, one intended victim was not even in the area at that time (*see People v Rizzo*, 246 NY 334 [1927]). It is also unclear whether defendant identified the correct house; after creeping through the neighborhood unsure of the exact location of the victims' house, defendant laid his shotgun down on a neighbor's lawn and paced in front of that neighbor's house. Under these circumstances, defendant's conduct did not satisfy the dangerous proximity standard (i.e., his conduct had not gone "to the extent of placing it in [his] power to commit the offense unless interrupted" [*People v Mahboubian*, 74 NY2d 174, 191 (1989)]).

Moreover, in the minutes that elapsed between the neighbor's call to the police and the arrival of the sheriff's deputy, defendant had ample time to charge into the residence and execute his plan; but he did not. While defendant's act need not be "the final one towards the completion of the offense" (*id.* at 190), defendant did not "pass[ ] that point where most [people], holding such an intention as defendant . . . , would think better of their conduct and desist" (*id.* at 191). Indeed, rather than proceeding with his plan, defendant disarmed himself and, upon the arrival of the police, surrendered to them. Although defendant's intent and plans were malevolent, his conduct was at best equivocal and this is insufficient to support a conviction of attempted murder and attempted burglary under these facts.

Chief Judge KAYE and Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Judge JONES dissents in part in a separate opinion in which Judge CIPARICK concurs.

Order affirmed.