17-4159-cr
USA v. Estevez

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: May 2, 2019   Decided: June 5, 2020)

Docket No. 17-4159-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

RANDY ESTEVEZ,

*Defendant-Appellant.**

_____

Before: KEARSE, WESLEY, and CHIN, *Circuit Judges.*

---

\* The Clerk of Court is directed to amend the official caption to conform with the above.

Appeal from a judgment of the United States District Court for the Southern District of New York, Colleen McMahon, *Chief Judge*, convicting defendant, a previously convicted felon, of being in possession of a firearm from on or about February 21, 2016, through on or about February 26, 2016, in violation of 18 U.S.C. § 922(g)(1), and sentencing him principally to 100 months' imprisonment. On appeal, defendant contends principally that the district court erred in giving the jury a general unanimity charge rather than, as he requested, instructing the jury that it must unanimously agree on the particular date or dates on which he possessed the firearm within the period alleged. He also asserts substantive and procedural challenges to his sentence. Finding no basis for reversal, we affirm.

Affirmed.

AMANDA KRAMER, Assistant United States Attorney, New York, New York (Geoffrey S. Berman, United States Attorney for the Southern District of New York, Kiersten A. Fletcher, Sarah K. Eddy, Assistant United States Attorneys, New York, New York, on the brief), *for Appellee*.

BRUCE R. BRYAN, Syracuse, New York, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Randy Estevez, who had been convicted of a felony in 2015, appeals from a judgment entered in the United States District Court for the Southern District of New York convicting him, following a jury trial before Colleen McMahon, *Chief Judge*, of being in possession of a firearm from on or about February 21, 2016, through on or about February 26, 2016, in violation of 18 U.S.C. § 922(g)(1), and sentencing him principally to 100 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Estevez principally challenges his conviction, contending that the district court erred in giving the jury a general instruction that its verdict must be unanimous, rather than, as he requested, instructing that the jury must agree unanimously on a particular date or dates on which he possessed the firearm in the six-day period of possession alleged in the indictment. He also challenges his sentence, contending that there was insufficient evidence to warrant an enhancement for possessing the firearm in connection with another felony offense, and that his 100-month prison term is substantively unreasonable. Finding no merit in Estevez's contentions, we affirm.

3

# I.  BACKGROUND

The single-count indictment against Estevez alleged, in pertinent part, that in violation of 18 U.S.C. § 922(g)(1),

> *[f]rom at least on or about February 21, 2016 through on or about February 26, 2016*, . . . RANDY ESTEVEZ, the defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess . . . a firearm . . . , to wit, a loaded 9 millimeter Stallard Arms semiautomatic pistol . . . .

(Superseding Indictment ("Indictment") ¶ 1 (emphasis added).)  The case grew out of shootings in the Bronx, New York, on those two dates.

A.  *The Evidence at Trial*

The government's evidence at trial as to the events of February 2016 was presented principally through the testimony of law enforcement personnel and cooperating witness Brandon Curley, together with security camera videos, DNA and ballistics evidence, cellphone records, and cell-site data.  The record, taken in the light most favorable to the government, shows the following.

### 1. *The February 21 Shooting*

In the early evening of February 21, New York City Police Department ("NYPD") officers responded to reports of shots fired in the vicinity of an IHOP restaurant located at 232nd Street and Broadway (the "IHOP"). They found no one injured, but they recovered a bullet fragment and two shell casings outside the restaurant. Security camera footage of the IHOP parking lot shortly before 6:00 p.m. showed a "muzzle flash" of gunfire and showed the suspected shooter running from the scene. (Trial Transcript ("Tr.") at 68.) However, as the shooter's face was not shown clearly, NYPD was unable to identify him using facial recognition software. (*See id*. at 72-73.)

### 2. *The February 26 Shooting*

#### a. *The Testimony of Curley*

Brandon Curley testified that Estevez was a friend he had known for nearly a decade (*see* Tr. 231, 234), with whom he would hang out and "[s]moke weed," *i.e.*, marijuana (*id*. at 236; *see id*. at 243). In January of 2016, Estevez had suggested to Curley that they rob a drug dealer known as "AB"; the plan had been that Estevez would call AB and arrange a meeting to purchase marijuana, and that Curley--with

5

a gun provided by Estevez--would interrupt the sale and rob AB, but "make it look like" he was also robbing Estevez. (*Id*. at 243-45.) However, Curley and Estevez abandoned the plan when one of Curley's friends, a seller for AB, learned of the scheme and persuaded them not to interfere with his source of income. (*See id*. at 244-45.)

Curley testified that on February 26 at approximately 1:00 a.m., while he was with a group of friends outside a building at 3340 Bailey Avenue (the "3340 Building" or "Building"), he received a call from Estevez, who proposed that the two of them rob a neighborhood marijuana dealer called "Sharkey." (*Id*. at 262-64.) Curley purported to agree, saying that Estevez should "hurry up and come now" to meet him in front of the Building, and that Estevez did not need to bring a gun because they could just beat Sharkey up. (*Id*. at 262-64.)

Despite that conversation, Curley, having been told that Estevez "always has a gun on him," expected that Estevez would bring a gun. (Tr. 263-64.) Curley also testified, however, that he never actually intended to help Estevez rob Sharkey; instead, he planned to take Estevez's gun if one was brought, and then Curley and a friend would beat up and rob Estevez. (*See id*. at 266.)

6

Estevez arrived minutes later, and Curley, learning that Estevez was in fact armed, asked to see the "grip"--local slang for "gun" (*id*. at 269; *see id*. at 345). Estevez passed the gun to Curley and then reached over and undid the safety device that would prevent the gun from firing. (*See, e.g., id*. at 272.) Seizing the opportunity, Curley pointed the gun at Estevez and demanded that he take off his coat; Estevez instead lunged at Curley and the two began grappling over the gun. (*See id*. at 272-73.) In the ensuing struggle, two shots were fired, one of them striking Estevez near the hip. Estevez eventually gained control of the gun, and Curley fled.

b. *Other Evidence About February 26 and February 21*

The scuffle between Curley and Estevez prompted a 911 call reporting that shooting had occurred near the 3340 Building. NYPD officers quickly arrived; they sought information from the wounded Estevez, who responded to a few of their questions but not others. Estevez was taken to a hospital and questioned further; his outer clothing was taken by the police as evidence. Meanwhile, back at the 3340 Building, officers found a black firearm--a Stallard Arms nine-millimeter semiautomatic pistol (the "Firearm")--under a white van parked near the Building. (*See* Tr. 62, 97-98, 103.)

7

Later that morning, an NYPD detective, being informed of the 911 call and the gun found under the van, went to the 3340 Building to view its security camera videos for the period shortly before the recorded time of the 911 call. On the Building videos, he saw, *inter alia*, two people engaging in a struggle; thereafter he saw a person (whom he later identified as Estevez) holding a gun in his hands, and then saw him walk toward the white van, crouch, and appear to throw an object under the van. (*See id*. at 127-28, 134-36, 149.)

The detective proceeded to view video from security cameras at a nearby deli or bodega. One video showed the man who had just crouched by the white van, walk in front of the deli. A few minutes later, the detective saw an NYPD anticrime unit arriving at the Building, and he saw the man who had thrown the object under the white van approach the crime squad officers. (*See id*. at 137-38.)

After viewing the deli's videos, the detective returned to the precinct and performed some computer checks. (*See* Tr. 153.) As a result of his investigation, the detective, who had not known or ever seen Estevez, learned what Estevez looked like. (*See id*. at 162.) He "conclude[d]" that it was "Randy Estevez" who had "approached the white van and put what appeared to be an object underneath that white van." (*Id*. at 150.)

8

Estevez was arrested later that day on New York State charges of criminal possession of a gun. He was subsequently indicted on the present federal felon-in-possession charge.

Forensic testing revealed the presence of Estevez's DNA on the Firearm's trigger guard. Ballistics analysis determined that the two discharged shell casings recovered from the scene of the February 21 shooting at the IHOP had been fired from the Firearm. The government also introduced evidence, based on cellphone records and cell-site location data, that at the times of the February 21 and 26 shootings, Estevez's cellphone had been near the locations of those shootings.

3. *Estevez Telephone Conversations During Pretrial Detention*

The government also introduced in evidence audio recordings of telephone calls made by Estevez from jail in the days after his arrest, and it provided transcriptions as aids (*see, e.g.*, Government Exhibit ("GX") 70-T, with "RE" referring to Randy Estevez, "UM" referring to an unidentified male speaker, and bracketed material denoting the transcriber's notes). During a recorded conversation on February 28, Estevez said he believed he would avoid being charged--that it was

9

"looking like a piece of cake, like, they don't got nothing on me" (GX 70-T at 3)--but

discussed the incident in part as follows:

> RE:  . . . *I had the grip, then he* was like "let me see that, nigga."  And *tried to snatch shit, that's how we started tussling with the shit* . . . .

> UM:  What, what, what I'm saying, you don't *think they gon' run a ballistic, check on that thing*?

> RE:  Aw, now the police?

> UM:  Yeah.

> RE:  I'm saying this shit, look like I'm beating this shit, bro.

> UM:  *Well, they got ya handprints on it*.

(*Id*. at 2 (emphases added); *see, e.g.*, Tr. 269, 345 (in that neighborhood, "grip" was

slang for "gun").)

> In a March 1 call, there was more discussion of the gun. Estevez said:

> RE:  *They could've found the gun* . . . they could've found the shit *under the van and just put two and two together and said I put it there* . . . .

> . . . .

> UM:  . . . what else, what else. . . . *did they mention anything about that Broadway shit too*?

> [Voice says:  you have one minute left]

10

RE: No, no, no.

UM: *That's good*.

(GX 72-T at 3 (emphases added).) The government argued in summation that "that Broadway shit" was a reference to the February 21 shooting at the IHOP on Broadway, and that the conversations evinced both concern that Estevez had been linked to that shooting and relief that there had been no ballistics comparison (*see* Tr. 579; *see also id*. at 593 (reminding the jury of the ballistics evidence that the shots on February 21 at the IHOP and those on February 26 near the 3340 Building were fired from the same gun).

4. *The Defense*

Estevez did not testify or present any evidence, although he argued as an affirmative defense that his possession of the Firearm on February 26 had been fleeting and necessary, as a response to an attack launched on him by Curley.

B. *Verdict and Sentence*

The jury, given a general instruction that it must be unanimous in its verdict (*see* Part II.A. below), found Estevez guilty on the sole count alleged in the

Indictment. As discussed in Part II.B. below, he was sentenced principally to 100 months' imprisonment, to be followed by three years of supervised release.

## II. DISCUSSION

On appeal, Estevez contends principally that the district court erred in denying his request for a particularized, rather than a general, unanimity instruction, and he challenges his sentence as procedurally and substantively unreasonable. We find no merit in his contentions.

A. *The Unanimity Instruction*

Estevez asked the trial court to instruct the jury that in order to find him guilty, it must agree unanimously that he possessed the Firearm on a particular date. Insisting that all jurors needed to agree either that he possessed the Firearm on February 21 or that he possessed it on February 26 (or that he possessed it on both dates), Estevez proposed a charge that included the following language:

> *The sole count in this indictment charges that the defendant committed the crime he is charged with on two different dates*, February 21, 2016 and February 26, 2016, and at two different locations.

12

> To find the defendant guilty, *you must agree unanimously on which particular date* and location the defendant possessed the firearm as a previously convicted felon.
>
> If some of you were to find that the government has proved beyond a reasonable doubt that the defendant possessed the firearm as described on February 21, 2016, and the rest of you were to find that the government has proved beyond a reasonable doubt that the defendant possessed the firearm as previously described on February 26, 2016, then there would be no unanimous agreement on whether the defendant is guilty of the one count in the indictment.

(Letter from Richard W. Barton, Esq., to Judge McMahon dated February 24, 2017, at 3 (emphases added).) Estevez proposed that the jury be given a verdict sheet on which it would be required to specify which date or dates, and which location or locations, the jurors had agreed on unanimously.

The court denied this request and gave the jury the following general unanimity instruction:

> The verdict must represent the considered judgment of each of the twelve of you. In order to return a verdict, all twelve of you have to agree. You have to be unanimous. We do not have nine-to-three verdicts in criminal cases. It's twelve to nothing.

(Tr. 668.)

Estevez contends that he is entitled to a new trial on the ground that the Indictment charged him with two crimes in its single count and hence was

13

duplicitous, *see generally United States v. Sturdivant*, 244 F.3d 71, 75 & n.3 (2d Cir. 2001) (a "duplicitous" complaint, *i.e.*, one alleging two or more separate crimes in a single count, potentially prejudices the defendant by creating uncertainty as to which of the charged crimes the jury unanimously found proven). Estevez contends that the court erred in declining to instruct the jury that it was "required to make special findings" "unanimous[ly] on the date and location of the alleged possession by Estevez of a firearm." (Estevez brief on appeal at 19, 18.) We disagree.

1. *Appellate Review of Jury Instructions*

"The propriety of a jury instruction is a question of law that we review *de novo.* . . . A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("*Wilkerson*") (internal quotation marks omitted); *see, e.g., United States v. Ferguson*, 676 F.3d 260, 275 (2d Cir. 2011) ("*Ferguson*"); *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011) ("*Applins*").

Similarly, "[t]he propriety of the district court's refusal to provide requested jury instructions is a question of law that we review *de novo.*" *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) ("*Gonzalez*"); *see United States v. McCarthy*,

14

271 F.3d 387, 396 (2d Cir. 2001). A defendant who requested an instruction the court declined to give "bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *Applins*, 637 F.3d at 72 (internal quotation marks omitted); *see, e.g., Wilkerson*, 361 F.3d at 732; *Gonzalez*, 407 F.3d at 122; *United States v. Dove*, 916 F.2d 41, 45 (2d Cir. 1990).

### 2. *Instructions as to the Requirement of Jury Unanimity*

"Federal crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime," and a jury "cannot convict unless it unanimously finds that the Government has proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see, e.g.,* Fed. R. Crim. P. 31(a); *see generally Ramos v. Louisiana*, 140 S. Ct. 1390, 1396-97 (2020). However, the "jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element." *Richardson*, 526 U.S. at 817.

As to how the jury should be instructed in this respect, "[w]e have, time and again, held that a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict." *United States v. Trupin*, 117 F.3d

15

678, 687 (2d Cir. 1997); *see, e.g., United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975) (district court sufficiently informed the jurors "that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict"); *United States v. Chandler*, 98 F.3d 711, 717 (2d Cir. 1996) (district court, refusing a request to require the jurors to "agree on a particular theory of how the defendant violated the law," sufficiently "instruct[ed] the jury that it must return a unanimous verdict"); *United States v. Harris*, 8 F.3d 943, 945 & n.2 (2d Cir. 1993) (district court sufficiently instructed that "'as always, your verdict must be unanimous. . . . [Y]our verdict must be unanimous on each count.'"); *Ferguson*, 676 F.3d at 280 (district court sufficiently instructed that "'it is necessary that each juror agrees to [the verdict]'" (brackets in *Ferguson*)). "'A general instruction on unanimity is sufficient to insure that such a unanimous verdict is reached, except in cases where the complexity of the evidence or other factors create a genuine danger of jury confusion.'" *Id*. (quoting *United v. Schiff*, 801 F.2d 108, 114-15 (2d Cir. 1986)); *see, e.g., United States v. Jackson*, 479 F.3d 485, 491 (7th Cir. 2007) ("*Johnny Jackson*") ("a general unanimity instruction is sufficient in the absence of a complex set of facts or a broad and ambiguous indictment that could easily confuse a jury as to the need for unanimity").

3. *Elements of the Offense of Possession Under 922(g)(1)*

Section 922(g)(1) provides, in pertinent part, that it is "unlawful for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year"--*i.e.*, a felony--to "possess in or affecting [interstate or foreign] commerce, any firearm." 18 U.S.C. § 922(g)(1). A sentence of up to 10 years' imprisonment is prescribed for any person who "knowingly violates" that section. Id. § 924(a)(2). The elements of the offense with which Estevez was charged are thus (1) his knowing prior conviction of a felony, (2) his knowing subsequent possession of a firearm, and (3) the firearm's nexus with commerce. As Estevez and the government stipulated that he had been convicted of a felony in July 2015 and that the Firearm had traveled in or affected interstate or foreign commerce, the disputed issue was possession.

The Indictment alleged that Estevez possessed the Firearm "from at least on or about February 21, 2016 through on or about February 26, 2016." Estevez contends that "[t]he crime of *possession [i]s complete in a single moment*," and that the Indictment in its single count thus alleged that he committed "separate crimes" on those two dates. (Estevez brief on appeal at 18, 31 (emphasis added).) Estevez's use of the word "complete" is correct in the sense that from the very moment a previously

17

convicted felon begins his knowing possession of a firearm (one having a nexus with commerce), he is subject to prosecution under § 922(g)(1). *Cf. Ball v. United States*, 470 U.S. 856, 862 (1985) (upon "recei[pt], a firearm is necessarily possessed" (internal quotation marks omitted)). But in suggesting that "complete" in that single moment means finished or ended, Estevez misconceives the nature of possession and of prohibitions against possession.

Possession may or may not be brief, but it is not the kind of instantaneous event that typically is concluded the moment it occurs; rather possession is conduct that normally spans some period of time. "The offense proscribed by section 922(g)(1) is not the felon's 'acquisition' of a firearm" but rather "is the felon's possession of a firearm." *United States v. Dillard*, 214 F.3d 88, 94 n.5 (2d Cir. 2000) ("*Dillard*"). "Indeed, it seems undeniable that in the case of many convicted felons, the reason why they possess guns illegally is to be able to use them in future acts or threats of violence." *Id*. at 100 n.12. Thus, "possession" of a firearm "is a continuing offense." *United States v. Waters*, 23 F.3d 29, 36 (2d Cir. 1994); *accord Johnny Jackson*, 479 F.3d at 491 ("[p]ossession of a firearm is a continuing offense which ceases only when the possession stops" (internal quotation marks omitted)). "The offense

18

continues to be committed as long as the felon continues to be in possession." *Dillard*, 214 F.3d at 94 n.5.

As possession is a continuing offense, "[t]he continuous possession of the same gun does not amount to a series of crimes, but rather constitutes a single offense." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989). Indeed, in order to convict a defendant "on two separate counts of being a felon in possession, the government would have . . . to prove that he *lost* possession of the gun at some point between the two charged dates." *Johnny Jackson*, 479 F.3d at 491 (emphasis in original); *cf. United States v. Praddy*, 725 F.3d 147, 157-58 (2d Cir. 2013) (government is not entitled to claim that a defendant continuously possessed a firearm after it had been seized from him upon his arrest).

In considering an allegation that a single offense of possession was committed during a specified time period, the jury may properly return a verdict of guilty if it finds unanimously that the defendant possessed the firearm at any point during that period. *See generally Richardson*, 526 U.S. at 817 (the "jury need not always decide unanimously which of several possible . . . underlying brute facts make up a particular element"); *see, e.g., Johnny Jackson*, 479 F.3d at 487, 491 (where the indictment charged the defendant with "possessing a firearm '[o]n or about July 12, 2004, through

19

July 15, 2004,'" it "charged *not multiple* offenses under one count of being a felon in possession, *but a single course of illegal conduct that spanned three days. . . .* If half of the jurors found that Jackson possessed the gun on July 12 and half found that he possessed it on July 15, the jury would still be unanimous that he possessed a gun *between* July 12 and July 15--which is exactly what the indictment charged." (last emphasis in *Johnny Jackson*; other emphases added)).

4. *The Present Case*

The case against Estevez was not complex. It was commenced with a simple one-count, one-paragraph indictment that charged him with being a felon in possession of the specified Firearm in the six-day period from February 21, 2016 through February 26. There was no indication in either the Indictment or the trial evidence that Estevez lost possession of the gun between those two dates. The government's evidence created a strong and uncomplicated record, including first-hand testimony by Curley, video evidence from security cameras, and Estevez's own postarrest recorded telephone statement, that Estevez possessed the Firearm on February 26; ballistics evidence that the Firearm had been fired at the Broadway IHOP on February 21; cell phone records and cell-site data indicating that Estevez

20

was in the vicinity of those February 21 and 26 shootings; and scientific tests revealing that the Firearm bore Estevez's DNA.

We conclude that the indictment properly charged, and the government proved, the single offense of Estevez's possession of the Firearm during the period alleged. The instruction requested by Estevez would have incorrectly charged the jury that the Indictment charged him with two offenses rather than one. As possession is a continuing offense, the jury was not required unanimously to pinpoint a precise time at which Estevez possessed the Firearm within the period alleged. The general unanimity charge delivered by the district court was correct and adequate. And if there were error, we would conclude, given the overwhelming evidence that Estevez possessed the Firearm on February 26, that the error was beyond a reasonable doubt harmless. We see no basis for overturning the jury's verdict.

B. *Sentencing Contentions*

Estevez contends that the imprisonment component of his sentence, 100 months, is both (a) procedurally unreasonable, arguing that there was error in district court's calculation of the range recommended by the Sentencing Guidelines ("Guidelines"); and (b) substantively unreasonable, arguing principally that the court

21

failed to take into account his youth, disadvantaged background, and abusive treatment he experienced while held in youth detention facilities. Both sets of contentions are to be reviewed under the abuse-of-discretion standard. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (en banc) ("*Cavera*"); *United States v. McGinn*, 787 F.3d 116, 129 (2d Cir. 2015) ("*McGinn*"); *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) ("*Rigas*"). Abuse of discretion may be found where the court has made either an error of law or a clearly erroneous finding of fact, or where its ruling "cannot be located within the range of permissible decisions." *E.g.*, *United States v. Flores*, 945 F.3d 687, 704 (2d Cir. 2019) (internal quotation marks omitted); *McGinn*, 787 F.3d at 129 (internal quotation marks omitted); *Rigas*, 583 F.3d at 114 (internal quotation marks omitted).

1. *The Guidelines Calculation*

To the extent pertinent to this appeal, the district court's calculations, under the 2016 version of the Guidelines, ultimately set Estevez's offense level at 22 and his criminal history category at VI; the Guidelines-recommended range of imprisonment was thus 84-105 months (*see* Sentencing Transcript, December 20, 2017 ("S.Tr."), at 34). The offense-level calculation included a four-step enhancement on

22

the basis that Estevez possessed the Firearm in connection with another felony offense. Estevez contends that there was insufficient evidence to support this enhancement. We disagree.

The guideline in question calls for a four-step increase in offense level if the defendant either

> possessed any firearm . . . in connection with another felony offense; or possessed . . . any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony.

Guidelines § 2K2.1(b)(6)(B). "In General," this provision "appl[ies] if the firearm . . . had the potential of facilitating[] another felony offense." Guidelines § 2K2.1 Application Note 14(A). "'Another felony offense'" is defined in pertinent part to "mean[] any federal[ or] state . . . offense, other than the . . . firearms possession . . . offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." *Id*. Application Note 14(C). In imposing an enhancement under § 2K2.1(b)(6)(B), the sentencing court need not recite each element of the "[]other felony offense," so long as it makes findings sufficient to permit meaningful appellate review. *See United States v. Legros*, 529 F.3d 470, 474 (2d Cir. 2008).

23

Estevez's trial counsel opposed application of this guideline, arguing that Curley's testimony should not be believed, and that the record showed only that Estevez hoped to commit a robbery "at some nebulous time in the future" (S.Tr. 16). His appellate counsel argues that "Estevez had agreed" with Curley that "they would not use a gun to commit the robbery" of Sharkey, and that "the robbery never occurred" (Estevez brief on appeal at 20). Their arguments are meritless.

First, the trial court--"the relevant trier of fact" with respect to sentencing (S.Tr. 34)--credited Curley's trial testimony (*see, e.g.*, *id*. at 12), and the record squarely contradicts counsel's suggestion that Estevez's aspirations for robbing Sharkey focused on some nebulous time in the future. Estevez called Curley at 1 a.m. on February 26 to suggest robbing Sharkey; Curley, purporting to agree, "told [Estevez] to hurry up and come now" (Tr. 264). Estevez arrived within minutes. (*See, e.g.*, GX 70-T at 2 (after arriving, Estevez "tussl[ed]" with Curley over the gun); Tr. 134, 144-45 (in the Building security camera video, the NYPD detective saw two people tussling, and thereafter recognized Estevez at 1:13:08).) That Estevez had intended to rob Sharkey immediately was clear, not clouded.

Second, the fact that the robbery of Sharkey never actually occurred is irrelevant. Under New York State law, attempt to commit robbery is a felony,

24

punishable by a prison term exceeding one year. *See* N.Y. Penal Law §§ 10.00, 110.05, 160.05, 160.10, 160.15. Estevez acknowledges that, with respect to § 2K2.1(b)(6)(B), the district court found that "'the firearm was possessed by the defendant in connection with another felony offense'" on February 26, "'*specifically, an attempt to commit a robbery*.'" (Estevez brief on appeal at 15, 21 (quoting S.Tr. 31-32, and noting that the court instructed that Estevez's presentence report ("PSR") be amended to so state) (emphasis ours).)

Estevez's only apparent effort to suggest that the evidence was insufficient to support the court's finding that he possessed the Firearm in connection with attempted robbery is his argument that in his call to Curley suggesting that they rob Sharkey, Curley said that Estevez did not need to bring a gun and "Estevez replied 'all right.'" (*E.g.*, Estevez brief on appeal at 36 (quoting Tr. 264).) However, it is undisputed that when Estevez went to meet his presumed accomplice Curley on February 26 he "brought a loaded nine-millimeter semiautomatic pistol" (Estevez brief on appeal at 6). The court found that "the reason why" Estevez had brought the Firearm with him was that "the gun was going to come in handy that night . . . because they were going to commit a robbery" (S.Tr. 34); "he was in the process of committing a crime of *attempted* robbery" (*id*. at 12 (emphasis added)). The district

25

court committed no error in inferring that Estevez brought the Firearm in order to have it with him for the planned robbery of Sharkey. Estevez's possession of the loaded Firearm plainly had the "potential of facilitating" an attempted robbery.

Estevez does not argue that his conduct was otherwise insufficient to constitute the crime of attempted robbery, nor would we agree with such an argument. Under New York law, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. "In order to constitute an attempt, the defendant's conduct must have passed the stage of mere intent or mere preparation to commit a crime . . . . In other words, the defendant must have engaged in conduct that came dangerously near commission of the completed crime . . . ." *People v. Naradzay*, 11 N.Y.3d 460, 466 (2008) (internal quotation marks omitted). In *Naradzay*, the defendant, who planned to shoot a woman who had spurned him, bought a shotgun, borrowed a car, drove to her street, and exited the car armed with the loaded shotgun. (*See id*. at 463-64.) But he was unsure of the exact location of her house. (*See id*. at 464.) While walking up the street, he was observed by someone who called 911; he was arrested after a responding officer saw him standing on the shoulder of the road, near the woman's driveway, the shotgun having been placed

26

next to a snowbank. (*See id*. at 464-65.) His convictions for both attempted murder and attempted burglary were affirmed. The Court rejected the defendant's contention that his actions "did not come 'dangerously near' commission of burglary and murder," *id*. at 466, despite the fact that "he had not yet picked up the shotgun [which he had, of course, brought with him, or] walked onto [the woman's] property[,] or tried to enter her home," *id*. at 467.

In the present case, the district court could likewise find that Estevez had committed the crime of attempting to rob Sharkey. Estevez plainly intended to rob Sharkey; he had called Curley precisely to enlist Curley's assistance in that robbery. Although the record does not indicate that Estevez knew Sharkey's exact whereabouts, Sharkey was a known drug dealer in the neighborhood; and when Estevez called Curley at 1 a.m. on February 26 to suggest that they rob Sharkey, Curley's purportedly enthusiastic response--"come now" and "hurry up"--plainly implied that Sharkey could be robbed in or near the 3340 Building. It was clearly permissible for the district court to infer that Estevez so understood that implication and that he did hurry, arriving minutes later, carrying his loaded Firearm, expecting to see or find Sharkey shortly and to rob him. The court did not err in inferring that

Estevez had gone sufficiently beyond mere intent or mere preparation to be dangerously near commission of his planned robbery.

In sum, we see no error in the district court's finding that Estevez possessed the Firearm on February 26 "because they were going to commit a robbery" "that night," or with the court's conclusion that Estevez had brought the Firearm because it would "come in handy" for the attempted robbery. We see no error of law or abuse of discretion in the court's application of the § 2K2.1(b)(6)(B) enhancement.

### 2. *Substantive Reasonableness*

Estevez asserts that his 100-month prison term is substantively unreasonable (*see* Estevez brief on appeal at 41-53), principally pointing to the facts that he was only 19 years of age at the time of his present crime, too young to be expected to have the maturity and judgment of an adult; that he had a disadvantaged youth, in that he was "frequently assaulted" when he was "held in custody in juvenile detention facilities for an extended period of his teenage years" (*id*. at 45-46); and that in light of his youth at the time of most of his prior convictions, his Guidelines criminal history "overstated the seriousness of his prior criminal conduct" (*id*. at 49).

We will "'set aside a district court's *substantive* determination' as to an appropriate sentence 'only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions.'" *United States v. McIntosh*, 753 F.3d 388, 394 (2d Cir. 2014) (quoting *Cavera*, 550 F.3d at 189 (emphasis in *Cavera*)). The "substantive unreasonableness standard[] in appellate review" is "deferential to district courts and provide[s] relief only in the proverbial 'rare case'" in which the sentence, "although procedurally correct, . . . was [so] shockingly high, shockingly low, or otherwise unsupportable as a matter of law" as to "damage the administration of justice." *Rigas*, 583 F.3d at 123. This is not such a case.

Estevez's sentencing contentions were argued at length, at and prior to sentencing; and the record indicates that the court considered his contentions and addressed the pertinent sentencing factors it was required to consider under 18 U.S.C. § 3553(a), in determining an appropriate sentence that would be sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. The PSR prepared on Estevez had calculated that his offense level was 28 and concluded that the Guidelines-recommended range of imprisonment was 140-175 months, but capped at 120 months by the 10-year statutory maximum for the offense. The district court's acceptance of some of Estevez's arguments reduced his offense level to 22,

29

thereby lowering the range to 84-105 months. The court also recalculated Estevez's criminal history points, although without similar effect. The PSR had calculated that Estevez had 18 criminal history points, which placed him in criminal history category VI--the highest Guidelines category. The court, over the government's objection, declined to include in the calculation Estevez's first conviction for robbery, which reduced his number of criminal history points to 15; however, his criminal history was so extensive that he remained in category VI.

The court observed that Estevez had earned an extraordinarily "high criminal history category" for one so young--*i.e.*, by the age of 19 (S.Tr. 34). It noted that whenever he got out of prison--"out on supervision" or "out under the thumb of law enforcement"--he "went right back to doing what [he] had been doing before." (*Id*. at 22.)

Although Estevez argues that because of his youth at the time of most of his prior convictions, the PSR overstated the "seriousness of his prior criminal conduct" (Estevez brief on appeal at 49), the court appropriately declined to conflate Estevez's personal characteristics with the nature of his crimes. It noted that "so far you spent your entire life doing nothing but violent things." (S.Tr. 21.) Indeed, of Estevez's nine prior convictions, one was for gun possession, and six were for robbery

or assault. The court stated, "I accept that terrible things happened to you in your life," and "I agree that the teenage brain is not completely formed." (*Id*.) And it stated, "at one level I can sympathize"; "[b]ut I feel a responsibility to society to protect the members of society from someone who is behaving the way that you have behaved." (*Id*. at 22.)

> Mr. Estevez has led a very, very violent young life. He has demonstrated repeatedly his contempt for authority, his inability or his unwillingness to follow the rules, including the rules on multiple occasions when he was on parole. This does not leave the Court feeling sanguine that he is a particularly good candidate now, or anytime in the near future, for being in the community under supervision.

(S.Tr. 33.) Noting that its revised Guidelines calculations resulted in a recommended imprisonment range of 84 to 105 months, the court sentenced Estevez to 100 months, stating,

> I conclude that a sentence toward the high end of the guidelines is appropriate but not greater than necessary, given the history and characteristics of the defendant, the nature of the crime, the need to impress upon the defendant the seriousness of his behavior, and as I have said several times, the need to protect society.

(*Id*. at 34.)

31

In sum, the record shows that the district court considered the § 3553(a) factors, considered Estevez's sentencing contentions, and, after weighing the relevant factors, imposed a sentence that was well within the bounds of its discretion. We see no unreasonableness in his sentence.

CONCLUSION

We have considered all of Estevez's arguments on this appeal and have found them to be without merit. The judgment is affirmed.