[869 NE2d 641, 838 NYS2d 465]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALFONSO WASHINGTON, Appellant.

Argued April 26, 2007; decided June 7, 2007

POINTS OF COUNSEL

*Office of the Appellate Defender,* New York City (*Sara Gurwitch* and *Richard M. Greenberg* of counsel), for appellant. I. Where Alfonso Washington explicitly stated that he did not want anything to happen to Seven—the alleged target of the conspiracy—until he, Mr. Washington, was released from jail, the undercover officer himself understood that the only agreement was for him to look for Seven, and the discussions between the undercover officer and Mr. Washington had not even progressed to the point where they discussed money, there is legally insufficient evidence of an agreement to kill Seven. (*United States v Jimenez Recio,* 537 US 270; *Iannelli v United States,* 420 US 770; *People v Caban,* 5 NY3d 143; *People v Berkowitz,* 50 NY2d 333; *United States v Wardy,* 777 F2d 101; *People v Bavisotto,* 120 AD2d 985; *People v McGee,* 49 NY2d 48; *People v Schwimmer,* 66 AD2d 91, 47 NY2d 1004; *United States v Feola,* 420 US 671; *United States v Rosenblatt,* 554 F2d 36.) II. In the alternative, there is legally insufficient evidence of an agreement to kill Seven because the purported agreement was conditioned on Alfonso Washington being released from jail—a condition he could not control and that was not likely to occur in the foreseeable future. (*United States v Melchor-Lopez,* 627 F2d 886; *United States v Anello,* 765 F2d 253; *United States v Brown,* 946 F2d 58; *United States v Palmer,* 203 F3d 55; *United States v Dworken,* 855 F2d 12; *United States v Prince,* 883 F2d 953; *United States v Podolsky,* 798 F2d 177; *United States v Feola,* 420 US 671; *Jackson v Virginia,* 443 US 307.)

*Robert T. Johnson, District Attorney,* Bronx (*Na Na Park, Joseph N. Ferdenzi* and *Nancy D. Killian* of counsel), for respondent. I. The evidence was legally sufficient to prove defendant entered into an agreement to hire the undercover police officer to kill Seven. (*People v Rossey,* 89 NY2d 970; *People v Bleakley,* 69 NY2d 490; *People v Ford,* 66 NY2d 428; *People v Norman,* 85 NY2d 609; *People v Deegan,* 69 NY2d 976; *People v Caban,* 5 NY3d 143; *People v Schwimmer,* 66 AD2d 91; *People v Berkowitz,* 50 NY2d 333; *People v McGee,* 49 NY2d 48; *United States v Jones,* 455 F3d 134.) II. Defendant's release from prison did not negate the preexisting conspiracy since his release was not a condition precedent to reaching an agreement, but a condition on when the killing would occur. (*People v Caban,* 5 NY3d 143; *United States v Feola,* 420 US 671; *United States v Wardy,* 777 F2d 101; *United States v Melchor-Lopez,* 627 F2d 886; *United States v Anello,* 765 F2d 253; *United States v Podolsky,* 798 F2d

177; *United States v Sharif,* 817 F2d 1375; *United States v Palmer,* 203 F3d 55; *United States v Yerli,* 857 F2d 1480; *United States v Prince,* 883 F2d 953.)

## OPINION OF THE COURT

CIPARICK, J.

The question presented by this appeal is whether a conditional agreement to murder a person in the future can be subject to prosecution under our conspiracy law. In particular, we are asked to determine whether evidence presented at defendant's nonjury trial was legally sufficient to support his conviction for conspiracy in the second degree (*see* Penal Law § 105.15). We conclude that the evidence presented was sufficient to support the conviction and that the contingencies imposed did not negate the existence of a conspiratorial agreement.

Defendant, while incarcerated at Rikers Island on child endangerment and promotion of prostitution charges, confided in fellow inmate, Martin Mitchell, who, unbeknownst to defendant, was a government informant, that he was willing to pay $5,000 to have the 14-year-old complaining witness in his child endangerment case killed. Mitchell, who was nearing release from Rikers Island, informed a New York City Police Department (NYPD) detective of his conversation with defendant. At the detective's request, Mitchell again met with defendant and told defendant that he knew of a hit man who would kill the intended victim. During this conversation defendant gave Mitchell a telephone number so that he could make contact with defendant's associates once he was released in order to arrange for the contract killing.

On August 23, 2002, Mitchell, who was now released from incarceration, visited defendant at Rikers Island. Their conversation was recorded as Mitchell was wired with a tape recorder at the request of the NYPD. During this meeting, defendant changed the intended victim of the contract killing from the complaining witness to a rival named "Seven," who had months earlier allegedly shot defendant in the head. Defendant also stated that he would now pay $4,000 to have Seven killed and expressed optimism that he would soon be getting out of jail.

A week later, Mitchell and an undercover officer, who posed as a hit man and was equipped with a hidden tape recorder, visited defendant at Rikers Island. Defendant, Mitchell and the undercover discussed that the complaining witness was to be

left alone and that the now intended target of the killing would be Seven. In the presence of the undercover, Mitchell told defendant that they would charge $4,000 for the hit. Defendant instructed the undercover to telephone coconspirator Crystal Rhodes to obtain information on contacting another of defendant's associates named Kenny so they could discuss the plan for killing Seven. Defendant wrote Rhodes's telephone number on a piece of paper for the undercover.

As defendant instructed, the undercover called Rhodes, who provided two telephone numbers to contact Kenny. The undercover called both numbers and an unidentified female answered and informed him that Kenny was unavailable. During the second call, the undercover discovered that Kenny was currently incarcerated.

On September 9, 2002, the undercover again called Rhodes, who attempted a three-way call with herself, defendant and the undercover, but because of a technical difficulty the three-way call was not established. Rhodes then relayed messages back and forth between the undercover and defendant. The undercover advised defendant that Kenny was presently incarcerated, at which time defendant agreed to have the undercover visit him the following Friday at Rikers Island.

On September 13, 2002, the undercover, who was again equipped with a tape recorder, returned to Rikers Island for another visit with defendant. During that conversation, defendant instructed the undercover to "[j]ust hold the girl" and, in regard to the other intended victim, to "wait [until he] g[o]t out . . . because [he wanted to] put [his] hands on some major money." The undercover inquired as to the identity of the intended victim, and defendant replied: "The one that I want done . . . [is the one] who got me set up for the shot. I was shot right here in the head . . . [His name is] Seven." Defendant further stated that he knew that Seven lived in Manhattan, but did not know the exact address; defendant then gave a general description of the location of Seven's apartment. Defendant also described Seven as being "six-one, six-two, slender build, real dark . . . [n]o gold teeth." Defendant continued: "When you [are] in jail, you ain't got nothin[g] . . . '[H]ere, take this thousand dollars.' I can't do that in jail, there's no money in my pocket in jail . . . all I got is my word." Defendant goes on to state that: "If I say its gonna happen, [you] know, to the best of my abilities, if it didn't happen, it means I got shot again or

something . . . [s]omething to really prevent it from happening . . . I really want him bad."[1]

Additionally, during this visit, defendant stated that he will "try to keep a tab on [Seven]" and the undercover stated that he will "open [his] eyes and go out lookin[g]." Defendant further stated that a woman he knows, Rabia Walker, "runs into him every now and then" and that "she could show [the undercover] the building" where Seven lives. The undercover then told defendant that he would take pictures of individuals fitting Seven's description at the building where Seven supposedly lived and show them to Walker for a positive identification. On September 20, 2002, the undercover spoke to Rhodes by telephone. Rhodes indicated that she was aware of the plan to have him take pictures of individuals matching Seven's description and that the pictures would be presented to Walker for identification. Rhodes then gave the undercover Walker's telephone number.

On September 22, 2002, the undercover called Walker, who acknowledged that she too knew of the plan to kill Seven and that she was to identify Seven from pictures that he would show her. The next day, the undercover telephoned Walker, at which time she stated that "there'll be no payments made or anything because [defendant] doesn't want anything done until he comes home." Shortly thereafter, defendant was arrested and charged with conspiracy in the second degree.

After a nonjury trial, Supreme Court decided that defendant and Mitchell entered into an agreement to fulfill defendant's intention to eliminate Seven. Supreme Court also found that "there were overt acts sufficient in this case as to constitute the legal prerequisite for a conspiracy in the second degree." The Appellate Division unanimously affirmed, holding that "the agreement to kill the intended victim remained firm, notwithstanding that defendant wanted the killing postponed [and that] evidence also established numerous overt acts in furtherance of the agreement, including steps taken to enable the hired killer to locate and identify the intended victim" (29 AD3d 362, 362-363 [2006]). A Judge of this Court granted leave to appeal, and we now affirm.

---

1. Defendant considered having Seven killed while Seven was incarcerated at Rikers Island at the same time as defendant; however, Seven was apparently released on bail before defendant could have him killed. Defendant, while reminiscing with Mitchell about the lost opportunity, stated that "it would be cheaper to get it done in jail anyway . . . 5 or 6 hundred [dollars] as opposed to the 4 thousand [dollars] I was gonna pay in the streets."

## Analysis

Defendant argues that the evidence against him was legally insufficient to support a finding that he entered into an agreement to kill Seven since he conditioned any action on his release from jail, he did not enter into an agreement to have Seven killed but only found and identified, and that there was no agreement since he and the undercover never discussed price. The People argue that under a sufficiency standard,[2] there was ample evidence offered at trial that proved that defendant entered into an agreement to kill Seven, overt acts in furtherance of that goal were committed and defendant did not place a condition on the agreement that prevented the formation of the agreement itself to kill Seven.

Section 105.15 of the Penal Law provides that "[a] person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." Furthermore, it is well settled that "[a] conspiracy consists of an agreement to commit an underlying substantive crime . . . , coupled with an overt act committed by one of the conspirators in furtherance of the conspiracy" (*People v Caban*, 5 NY3d 143, 149 [2005]).

We are here presented with the question whether conditions placed on an agreement can negate the existence of a conspiracy. The federal circuit courts provide some guidance in this regard since they have considered whether a purported agreement that is conditioned by a defendant can be considered an agreement to commit an unlawful act under conspiracy law. The First and Eighth Circuits have adopted the approach that an agreement with a condition will be effective only if the defendant subjectively believes the condition is likely to be fulfilled (*United States v Anello*, 765 F2d 253, 262 [1st Cir 1985]; *United States v Brown*, 946 F2d 58, 61 [8th Cir 1991]). The Appellate Division here relied upon the First Circuit's holding in *United States v Palmer* (203 F3d 55, 64 [1st Cir 2000]), which followed *Anello*, where the federal court held that "[l]iability should attach if the defendant reasonably believed that the conditions

**2.** The standard for determining legal sufficiency "is whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to conclude that the elements of the crime had been proven beyond a reasonable doubt" (*People v Rossey*, 89 NY2d 970, 971 [1997]; *see also People v Bleakley*, 69 NY2d 490, 495 [1987]). All reasonable inferences must be drawn in the People's favor (*see People v Ford*, 66 NY2d 428, 437 [1985]).

would obtain." In *Anello*, the defendant had conditioned his purchase of marijuana on its quality. The defendant, however, proceeded with obtaining the funds to purchase the drugs in anticipation that his quality concerns would be met. The court found "that the 'quality' condition was unlikely to prove a serious impediment" (*Anello*, 765 F2d at 263) to the formation of the agreement to purchase the marijuana, since the defendant subjectively believed that the condition would be fulfilled and, as such, proceeded to fulfill his obligations under the agreement.

Three other circuits take a different approach, holding that conditions to an agreement are legally irrelevant (*see United States v Grassi*, 616 F2d 1295, 1302 [5th Cir 1980]; *United States v Prince*, 883 F2d 953, 958 [11th Cir 1989]), unless the conditions are so unlikely to be met that the agreement is illusory (*United States v Podolsky*, 798 F2d 177, 179 [7th Cir 1986]). We need not go as far as this to resolve this case; even under the *Anello*, *Palmer* and *Brown* test, defendant's conviction would be upheld. Defendant reasonably believed the condition to the execution of the planned murder—his release from prison—would occur.

Defendant asks us to reject all the federal cases just cited in favor of *United States v Melchor-Lopez* (627 F2d 886, 891 [9th Cir 1980]), which he reads as holding that there is no legally effective agreement if conditions are set but not fulfilled. This is a misreading of *Melchor-Lopez*, which involved not a conditional agreement but the absence of any agreement. In *Melchor-Lopez*, "government agents produced $80,000 in an effort to induce Melchor-Lopez to bring heroin into the United States for sale, [but] he steadfastly refused to agree to any such transaction, insisting that any transfer would have to be made in San Luis, Mexico" (627 F2d at 889). The Ninth Circuit held that "the evidence fell far short of showing an agreement because [the defendant] firmly insisted on certain conditions unacceptable to his would-be co-conspirators" (627 F2d at 891). *Melchor-Lopez* thus stands for the proposition that "conditions" demanded by a party which are "unacceptable" to the other party may create an inability for the parties to enter into an agreement.

Here, neither party imposed a condition on entry into the agreement that was unacceptable to the other. Similarly, we have previously held that an "agreement" to murder a victim is effectuated when the coconspirators *accept* the defendant's

invitation to kill the victim (*see Caban,* 5 NY3d at 149). Thus, the determinative factor is whether there was an agreement—not whether agreed-upon conditions made the performance of the agreement contingent upon the happening of an event.

Here, the conditions that defendant imposed on the performance of the agreement—to commit a murder—were that nothing was to happen to Seven until defendant was released from jail and was able to secure money to pay for the hit. These requirements were not "conditions" negating the existence of an agreement to kill Seven—they were terms of the agreement. In other words, defendant's wish to delay the killing and payment until he was released from prison was not a demand in negotiations that prevented the parties from reaching the agreement to kill Seven, but a temporal component of the agreement accepted by both parties.

A conspiratorial agreement will be found where there is a "concrete and unambiguous . . . expression of [defendant's] intent to violate the law" (*Caban,* 5 NY3d at 149, quoting *People v Schwimmer,* 66 AD2d 91, 95 [2d Dept 1978], *affd* 47 NY2d 1004 [1979] *for reasons stated below*). Both Mitchell's and the undercover's testimony reveal that defendant entered into an agreement to commit the underlying substantive crime of murder in the first degree, and that there were overt acts committed in furtherance of that goal (*see Caban,* 5 NY3d at 149).

Defendant also proposes that since the amount to be paid to the undercover was not agreed upon there could be no conspiratorial agreement. Clearly, there was evidence that the parties agreed upon the price. In the initial meeting between defendant and Mitchell, defendant mentioned a $4,000 price, and defendant could not have doubted that Mitchell had passed that number on to the undercover (the supposed hit man). Moreover, at a later meeting in the presence of the undercover, Mitchell repeated that figure to defendant as the price for the hit, and defendant responded, "[y]eah, yeah, yeah." Thereafter, the parties worked out the details of the conspiracy, defendant dispatched the undercover to locate the intended victim, and defendant coordinated with his associates outside of prison to assist in locating and identifying the intended victim. The evidence was therefore sufficient to support the conclusion by the finder of fact that an agreement had been made.

Therefore, viewing the evidence in a light most favorable to the People and drawing all reasonable inferences in their favor as we must, we conclude that defendant's conviction was supported by the evidence presented at trial.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge KAYE and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed.