# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 81
The People &c.,
  Appellant,
  v.
Benito Lendof-Gonzalez,
  Respondent.

Submitted by Mary Jean Bowman, for appellant.
Submitted by Robert M. Graff, for respondent.

FEINMAN, J.:

Under our long-standing precedents, a person is guilty of an attempt to commit a crime if the person's conduct comes "dangerously close" to committing the intended crime (*People v Mahboubian*, 74 NY2d 174, 191 [1989]; *People v Moran,* 123 NY 254, 257

- 1 -

[1890]). The People's evidence in this case was insufficient to support defendant's convictions for attempted murder in the first and second degrees because it failed to prove that defendant and his feigned confederate took any actual step toward accomplishing defendant's plan to kill his wife and mother-in-law beyond mere conversations and planning. Accordingly, we affirm.

Viewed in the light most favorable to the People, the relevant events in this case unfolded over several days in May 2016 at the Niagara County Jail, where defendant was being held after his arrest at a mobile home in late April for alleged acts of domestic violence against his wife. On May 16, the inmate in the adjoining cell (hereinafter MS) used the communal phone in the cell block to call his girlfriend. The couple discussed obtaining bail for MS and mentioned the impending eviction from their apartment. Once MS had returned to his cell, defendant knocked on the wall and passed a note through the cell bars. The note proposed a deal. Defendant would give MS a house if MS did "two things" for him: kill his wife and mother-in-law using "shop heroin and new drugs"; and make arrangements for the care of his two children. Defendant asked that MS complete his end of the bargain as soon as he was released from jail, and defendant sent a note stating an address and the names of the two targets along with instructions on the time the murders should take place.

Although MS had no intention of following through on defendant's requests, he played along. He wrote defendant that he expected to be released in two days, on May 18, and could "do it" on either May 19 or May 20. Defendant asked that the job be done "clean[ly] with drugs" and with "[n]o violence," and requested that MS "[u]se gloves." In

a "detailed plan to follow," defendant gave instructions on how to carry out the murders: MS was to display drugs on a table to stage a fake overdose, get the victims' fingerprints on "everything" that MS used to kill them, pick up keys to the house and cars, and take defendant's two young children with him once he was done. After this initial back-and-forth with defendant, MS informed a correction officer that he had "very serious information" to share and turned over the notes to the jail authorities. They told him to continue communicating with defendant and act as though the plan would proceed as discussed.

The next morning, on May 17, defendant provided MS with a hand-drawn map showing the location of a third party's house, where, according to defendant's instructions, MS was to take the children after killing defendant's wife and mother-in-law. Defendant also gave MS a letter for the third party. Lastly, defendant instructed MS on where to park when he arrived at the targets' identified address and gave a vague description of the location of a hidden set of keys—"on the left up to your head"—for MS to use after making sure that the two targets were inside. MS turned these notes over to the authorities and was removed from his cell block until his release from jail the next day.

After being released on bail, MS learned from his girlfriend that defendant had called, using a number provided by MS, and asked that MS visit him in jail. In coordination with the authorities, MS recorded his conversation during his visit with defendant on May 19. Defendant discussed the "game plan" for the murders and presented MS with a paper he asked him to read, which MS understood to be a blueprint for a suicide letter to make it look like defendant's wife committed suicide. According to defendant's plan, MS would

kill the wife and mother-in-law that evening and call defendant the next day using prearranged code words to confirm that the murders had been carried out. MS received a call from defendant the following day, on May 20. Speaking in code, MS told defendant that the "cars" (defendant's wife and mother-in-law) had been "fixed" (killed) and that the "tires" (defendant's children) were with him. Defendant said he was "happy now." Defendant called MS on May 24 to again confirm that MS had fixed the "cars" and taken care of the "tires." After MS expressed concern about when defendant would give him the house, defendant said he had "another place" where MS could stay for "free."

At the close of the People's case, defendant moved to dismiss all counts, arguing that, with respect to the attempted murder counts, there was no evidence of conduct "beyond exchange of letters and some conversation"—that is, nothing beyond mere preparation and planning—and no proof of conduct "carrying the project forward with dangerous proximity . . . to the criminal end to be attained" that would satisfy the requisite "dangerously close" standard for an attempt. The trial court denied the motion, finding that the case "just barely survives."

In defining attempt, the court charged the jury that "[c]onduct which tends to effect the commission of a crime means conduct which comes dangerously close or very near to the completion of the intended crime," and that a person is guilty of an attempt to commit a particular crime if the person "intends to commit a crime and engages in conduct which carries his or her purpose forward within dangerous proximity to the completion of the intended crime." The jury convicted defendant of two counts of attempted murder in the first degree, two counts of attempted murder in the second degree, and one count of

criminal solicitation in the second degree. Defendant moved to set aside the verdict with respect to the attempted murder convictions on the ground that the evidence showed no "affirmative action beyond the planning," but the trial court denied the motion. On defendant's appeal, the Appellate Division vacated the convictions for attempted murder, holding that the evidence at trial was legally insufficient to establish that defendant engaged in conduct that came "dangerously near commission of the completed crime" (170 AD3d 1508, 1510 [4th Dept 2019], quoting *People v Naradzay*, 11 NY3d 460, 466 [2008]). Noting that "several contingencies stood between the agreement in the [jail] and the contemplated [crimes]," the court determined that the "evidence establishes only that defendant planned the crimes, discussed them with the inmate in the next cell and with that inmate's girlfriend, and exchanged notes about them" (*id.*, quoting *People v Acosta*, 80 NY2d 665, 671 [1993]). A Judge of this Court granted leave to appeal.[1]

When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether "there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 349 [2007] [quotation marks omitted]). The crimes at issue in this appeal are attempted murder in the first degree and attempted murder in the second degree. As relevant here, the crime of first-degree murder requires the People to prove that a defendant caused another person's death

---

[1] Contrary to defendant's contention, we have jurisdiction to review the question of law presented here as legal sufficiency is a question of law and the relevant arguments were preserved at trial.

with the intent to do so and "procured commission of the killing pursuant to an agreement with a person other than the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement" (Penal Law § 125.27 [1] [a] [vi]). For second-degree murder, the People must prove that a "defendant cause[d] the death of another with the intent to do so" (Penal Law § 125.25 [1]). The inchoate versions of these offenses, as charged here, layer on the definition of criminal attempt set forth in Penal Law § 110.00, which provides that a "person is guilty of an attempt to commit a crime when, with intent to commit a crime, [the person] engages in conduct which tends to effect the commission of such crime."

The mens rea element is not at issue in this case. The People's evidence overwhelmingly supports a rational jury's conclusion that defendant specifically intended to kill his wife and mother-in-law, entered into an agreement to procure the services of MS to carry out his plan, and was "happy" when he was told that the murders had been carried out. Instead, the case turns on whether, as a matter of law, the People adduced sufficient evidence of conduct to satisfy the actus reus requirement for attempted murder.

It is well established that the "law does not punish evil thoughts, nor does it generally consider mere preparation sufficiently dangerous to require legal intervention" by imposing attempt liability (*People v Bracey*, 41 NY2d 296, 300 [1977] [citations omitted]). Rejecting the more lenient "substantial step" test and adhering to the close-proximity test (*Mahboubian*, 74 NY2d at 191), our Court has repeatedly reaffirmed that, to constitute an attempt, "the defendant's conduct must have passed the stage of mere intent or mere preparation to commit a crime" (*Naradzay*, 11 NY3d at 466; *see also People v*

*Rizzo*, 246 NY 334, 337 [1927]). Although the "act need not be 'the final one towards the completion of the offense'" (*Bracey*, 41 NY2d at 300, quoting *People v Sullivan*, 173 NY 122, 133 [1903]), it must be "so near to its accomplishment that in all reasonable probability the crime itself would have been committed, but for timely interference" (*Rizzo*, 246 NY at 334 ["The act or acts must come or advance very near to the accomplishment of the intended crime"]).[2] Stated differently, the acts must come "dangerously near" commission of the completed crime (*Naradzay*, 11 NY3d at 466; *see People v Werblow*, 241 NY 55, 61 [1925] ["Acts in furtherance of a criminal project do not reach the stage of an attempt, unless they carry the project forward within dangerous proximity to the criminal end to be attained"]).

As we have previously explained, "the boundary where preparation ripens into punishable conduct depends greatly on the facts of the particular case" and "differs with different crimes" (*Mahboubian*, 74 NY2d at 190-191). Although the "necessity of further steps for completion of the crime and the possibility of abandonment or renunciation are factors to be considered in evaluating whether conduct has come 'dangerously close' to success," those factors "are not dispositive" (*id.*). The inquiry "focus[es] on the steps defendant took to accomplish the crime, rather than on the actions or disposition of the particular . . . victim" (*People v Denson*, 26 NY3d 179, 188 [2015]).

---

[2] The Legislature has revised the statutory definition of attempt since *Rizzo* was decided. However, this Court subsequently reaffirmed the "dangerous proximity" standard, reasoning that the legislative history demonstrated a clear intent to maintain *Rizzo* (*People v Di Stefano*, 38 NY2d 640, 652-653 [1976]).

Here, the only conduct to be considered is defendant's own acts because his purported accomplice, who was working with the authorities, did not take any steps toward furthering the planned murders other than listening to defendant's scheme. MS did not, for example, acquire the instrumentality for the crimes (such as drugs or poison), verify the existence of the keys and obtain them from the stated location, or stake out the address supplied by defendant to make sure that the wife and mother-in-law were present at the location specified. Nevertheless, the People, mostly by parsing defendant's communications with MS, argue that defendant engaged in sufficient conduct by: (1) promising to provide a house to MS; (2) giving MS the purported address of the targets; (3) instructing MS when to carry out the murders; (4) providing MS with a hand-drawn map of the location of the third party's house, where MS was to drop off the children after the murders; (5) handing MS a detailed plan of how to carry out the murders; (6) telling MS the location of the keys to the house; (7) calling MS's girlfriend to arrange for MS to visit the jail; (8) writing a fake suicide note; (9) showing MS the suicide note; and (10) creating a prearranged code to discuss the postmortem over the recorded jail phone.

Not only are these acts "preparatory in a dictionary sense" (*Mahboubian*, 74 NY2d at 191), they are also limited to the planning stages of committing the offense: they specify the who, what, where, when, and how of defendant's murder plans. Notably absent are any acts that can be deemed to bring the crimes dangerously close to completion. Indeed, numerous contingencies necessary for the crimes' commission remained unfulfilled.[3]

---

[3] There is no dispute that the evidence here was legally sufficient to support defendant's conviction for criminal solicitation in the second degree, based on defendant's conduct in

Although the attempt standard is fact specific, what is missing here is any act that, when viewed in the light most favorable to the People, could satisfy the dangerous-proximity test. Defendant's initial promise to give MS a house was just that—a simple promise. It did not advance the scheme's chance of success. Defendant neither made a cash payment nor provided MS with any means to purchase drugs for the murders.[4] Defendant did not provide a murder weapon (*cf. Naradzay*, 11 NY3d at 467 [finding that defendant's conduct came "dangerously near" to murder where "he filled his pocket with 25 sabot slugs, loaded a shotgun capable of hitting a target accurately at a distance of 100 yards with four of these slugs, including one in the chamber, and stood mere steps away from the property of his intended victims"]). And although defendant provided an address, nothing in the trial

___

soliciting MS to murder his two targets (Penal Law § 110.10). On the continuum of anticipatory crimes set forth in the Penal Law, the crime of conspiracy is next on the spectrum after criminal solicitation and requires proof of an "overt act" in furtherance of an agreement with one or more persons to commit a crime (*see People v Ribowsky*, 77 NY2d 284, 293 [1991]; *People v Bongarzone*, 69 NY2d 892, 896 [1987]). For reasons not revealed in the record, the People did not charge defendant with conspiracy to commit a murder, which is designated by the legislature as a class B felony (*see* Penal Law § 105.15).

[4] Sometimes, even the fact of payment may not, when taken with other facts, be sufficient to satisfy the dangerous-proximity standard (*see e.g. People v Putnam*, 130 AD2d 52, 55 [3d Dept 1987] [finding evidence legally insufficient to sustain a conviction for attempted murder where the defendant paid the hired killer "a sum of money as his fee for the killing"]; *State v Melton*, 371 NC 750, 752, 757-758, 821 SE2d 424, 425-426, 428 (2018) [vacating a conviction for attempted murder under North Carolina law—which, like New York law, requires conduct beyond mere preparation—even though the defendant paid an undercover officer $10,000 to kill his ex-wife]; *Commonwealth v Hamel*, 52 Mass App Ct 250, 256, 752 NE2d 808, 813 [Mass App Ct 2001] [reasoning that tendered payment in the form of access to a marijuana field did not come dangerously close to "physical perpetration of the murders"]). In contrasting our facts with those in other cases, we do not express an opinion on whether any act missing here would have been legally sufficient to convict defendant for attempt. The comparison nevertheless shows that the People's proof in this case falls short of what is legally required.

record establishes that the wife and mother-in-law, in fact, lived or could be found there.[5]

Nor does the proof establish that defendant provided any other information that MS could have used to track down the intended victims.[6] The other acts listed by the People—such as producing a hand-drawn map, a "detailed plan," and a fake suicide note—consisted of instructions on how to carry out and cover up the murders. They were not actual steps that brought defendant or MS dangerously near or in close proximity to committing the murders (*cf. People v Trepanier*, 84 AD2d 374 [4th Dept 1982] [finding attempt where the defendant made an advance payment to a pseudo-arsonist, removed boards covering a window, and left the window open to allow the arsonist into the building]).

Despite the absence of actual steps beyond mere planning, the People point out that defendant believed MS could and would execute the plan. They cite Penal Law § 110.10 and reason that, as long as defendant believed that MS somehow had the ability to procure and use the drugs to fake the suicide of the wife and murder the mother-in-law and that the targets would be present at the stated address, it is no defense that commission of the completed crimes was not possible as the attendant circumstances were not as defendant

---

[5] A police witness testified that he arrested defendant for domestic violence allegedly committed against his wife, after being "dispatched" to a mobile home on April 21, 2016 at the same address defendant provided to MS. However, no proof was elicited to establish who owned or lived in the mobile home.

[6] We do not intend to suggest that providing information on how to locate a victim would necessarily be to cross the line from preparation to attempt. Some courts have found that act not determinative in murder-for-hire cases (*see e.g. Melton*, 371 NC at 752, 821 SE2d at 425-426 [holding there was no attempted murder, even though the defendant gave the undercover officer his ex-wife's name, address, and phone number; provided pictures of the victim; specified ex-wife's routine; and described her car]).

believed them to be. But Penal Law § 110.10 does not dispense with the requirement that, to be found guilty of attempt, a defendant must "engage[e] in conduct which tends to effect the commission of [the] crime" (Penal Law § 110.00). The People still had to prove that "the conduct in which [defendant or his agent] engage[d] otherwise constitutes an attempt to commit" murder (Penal Law § 110.10)—in other words, that defendant or his agent engaged in conduct that came dangerously near or in close proximity to committing the murders (*see Mahboubian*, 74 NY2d at 191). The People failed to do so here.

By equating defendant's agreement and planning with MS with the acts necessary to support the attempted murder convictions, the dissent effectively dilutes the level and nature of the proof required for an attempt to commit a crime. In a conspiracy prosecution, the People must prove the commission of an overt act in furtherance of the conspiracy (Penal Law § 105.20), which "provides corroboration of the existence of the agreement" and shows that "the agreement has reached a point where it poses a sufficient threat to society to impose sanctions" (*People v McGee*, 49 NY2d 48, 58 [1979]).[7] However, the acts required to establish attempt culpability are qualitatively different from the overt acts

_____

[7] The agreement defendant made with MS here is strikingly similar to the defendant's conduct in *People v Washington* (8 NY3d 565 [2007]), which was legally sufficient to support a conviction for conspiracy in the second degree. There, the inmate solicited and agreed to pay a government informant for the killing of a rival and engaged in overt acts in furtherance of that agreement, including providing the feigned confederate with a telephone number to contact the defendant's associates to arrange for the contract killing (*see also Bongarzone*, 69 NY2d at 896 [evidence sufficient to find an overt act in support of a conviction for conspiracy to kill an eyewitness to the defendant's automobile accident, which resulted in two deaths, where the defendant provided payment to an undercover officer to kill the witness, provided a photograph of the intended victim, and made telephone calls to his mother and sister in furtherance of the plan]).

needed for a conspiracy to commit a murder; they are acts that tend to effect the substantive crime and demonstrate the nearness or immediacy of defendant's commission of the crime (*see e.g. Naradzay*, 11 NY3d at 467-468 [defendant guilty of attempted murder where he was found by police outside intended victim's home with a shotgun, ammunition, and to-do list outlining the murder plot in his pocket]; *People v Dlugash*, 41 NY2d 725, 735 [1977] [defendant guilty of attempted murder where he shot victim whom he believed to be alive at the time]). Indeed, cases in which we ultimately concluded that the defendant's acts fell short of the "dangerously near" standard for an attempt conviction demonstrate how close to the commission of the substantive crime our precedents require the defendant's conduct to progress to constitute an attempt (*see e.g. People v Mike*, 92 NY3d 996, 999 [1998] [defendant offered to sell drugs to undercover officers, entered officers' vehicle, and led them to a building, but officers' refusal to give defendant money or accompany him into building was insufficient to sustain attempted sale conviction, even though defendant later gave a statement indicating he intended to sell them cocaine]; *Rizzo*, 246 NY at 336, 338-339 [conviction for attempted robbery reversed where defendant and his confederates drove in their car looking for their robbery target, a payroll man, but could not find him]). Here, in stark contrast, despite a specific intent to kill, an agreement with a confederate to commit the crimes, and acts corroborating that agreement, there was no evidence of any acts that carried the murder plot "forward within dangerous proximity to the criminal end to be attained" (*People v Warren*, 66 NY2d 831, 832 [1985]). While defendant's creation of a master plan and solicitation of a person who was not going to do anything to carry out that plan was sufficient to establish his criminal culpability for other anticipatory crimes,

his inability to perform the requisite acts himself cannot substitute for evidence that the intended crimes were dangerously close to completion. In sum, the evidence was legally insufficient to support defendant's convictions for attempted murder.

Accordingly, the Appellate Division order, insofar as appealed from, should be affirmed.

RIVERA, J. (dissenting):

On this appeal, we must determine whether the trial evidence was legally sufficient to support defendant's conviction on four counts of attempted murder based on the steps defendant took to accomplish those crimes at the hands of his hired accomplice, who was

- 1 -

in actuality a government informant. Under our law, the evidence is sufficient if, viewed in the light most favorable to the prosecution, defendant's conduct was dangerously close to achieving the crimes, but for his accomplice's cooperation with the authorities (*see People v Mahboubian*, 74 NY2d 174, 192 [1989]; *People v Dlugash*, 41 NY2d 725, 738 [1977]; *People v Rizzo*, 246 NY 334, 337 [1927]; *People v Lawton*, 56 Barb 126, 132 [NY Gen Term 1867]); *People v Bush*, 4 Hill 133, 134 [NY Sup Ct 1843]).[1] That threshold is met here. Defendant provided the informant with the names and address of the intended victims, the location of the keys to enter their home and directions on how and when to accomplish the crimes, as well as a financial incentive for committing the murders. Further, because defendant was incarcerated, the informant worked with law enforcement to convince defendant that nothing remained to be done other than the murders at the hands of his supposed accomplice.

Defendant's singular purpose was to ensure, from a distance, the inevitable commission of the murders by his accomplice. Nonetheless, the majority concludes that the acts taken by defendant never passed "mere conversations and planning" (majority op at 2). The majority reaches that conclusion by engaging in a weight of the evidence analysis

---

[1] The reports of Nicholas Hill (1805-1859) include the decisional law of our immediate predecessor, the Court for the Trial of Impeachments and Correction of Errors, established under the New York Constitution of 1777, and the Supreme Court of Judicature, established in 1691 by Colonel Henry Sloughter, the colonial governor of New York (The Judges of the New York Court of Appeals: A Biographical History xxvii- xxix [Albert M. Rosenblatt ed., 2007]; *see also* Henry Wilson Scott, The Courts of the State of New York: Their History, Development and Jurisdiction 321 [1909], citing Const of 1777, art 32). The Court for the Trial of Impeachments and Correction of Errors consisted of, among others, judges of the Supreme Court (Rosenblatt, supra, at xxix, citing Const of 1777, art X).

that questions the viability of defendant's murder-for-hire scheme (*id.*). But our law is clear that we may consider only whether the evidence was legally sufficient, not whether the evidence was factually persuasive, to support defendant's conviction (*see People v Danielson*, 9 NY3d 342, 349 [2007]). Given that the accomplice never intended to commit the crimes, the majority cannot point to a single step that remained to be taken for defendant to ensure that the intended murders would be committed as he planned them. The majority essentially rejects our individualized approach to criminal-attempt liability and instead erects a contrived hurdle to prosecuting a contract murder where the hired killer is an informant. I dissent.

I.

Defendant Benito Lendof-Gonzalez was convicted upon a jury trial of two counts each of first- and second-degree attempted murder, and one count of criminal solicitation in the second degree. The prosecution's theory was that defendant enlisted someone to commit the murders, and his plan was thwarted only because his intended accomplice was cooperating with the authorities.

At trial, the prosecution presented defendant's booking card and testimony from a state police officer who explained that defendant was arrested and held in custody at the county jail pending prosecution on charges of second-degree menacing, criminal obstruction of breathing and blood circulation, fourth-degree criminal possession of a weapon, first-degree unlawful imprisonment, third-degree assault and second-degree harassment for his alleged attack on his spouse.

On Monday, May 16, approximately one month into defendant's detention, defendant was in punitive segregation.[2] The inmate in the adjoining cell, MS, testified that, on that day, he was on a telephone call directly across from defendant's cell, discussing his bail status with his girlfriend, HG, as well as their impending eviction from the home that they shared prior to his incarceration. When MS finished the call and returned to his cell, defendant knocked on their shared wall and passed MS a paper upon which he had written the first of several notes that they would exchange over the next few minutes.

Defendant offered MS "a deal" in which he would give him a house once defendant was released, if MS killed defendant's spouse and mother-in-law using drugs. Defendant also asked that MS take his two children out of the house after the murders. MS pocketed defendant's note and wrote to defendant on a new piece of paper: "with heroin? That would be done pretty easily. Where is she from Lockport or Buffalo?" Defendant responded that he wanted it done that week, after MS was released and requested a telephone number to contact MS. MS provided a fake number but later provided defendant with HG's number.

Defendant then sent a note with the names of the intended victims, when he wanted them murdered (between 9:30 and 10 p.m.), and an address, which was the same address where defendant was arrested for the alleged assault on his spouse. MS again pocketed the

---

[2] MS described punitive segregation, or double-lock, as mandatory segregation in which inmates are kept alone in a cell for 23 hours a day. An officer from the County Sheriff's Office also testified that inmates housed in the punitive segregation cell block are limited to one phone call a week.

note and on a separate paper asked whether he should use straight heroin or mix it with poison. "Absolutely. [When] can you do it?" defendant responded.

Defendant and MS further agreed that if MS was released on bail on Wednesday, he would commit the crimes on Thursday. Defendant directed that the murders should take place "between 9:30 and 10 because [defendant's spouse] leaves the door open sometimes. No violence. Clean. Use gloves." MS was to take defendant's two children with him after completing the murders.

Finally, on a last piece of paper with "detailed plan to follow" written across the top, defendant wrote six paragraphs of instructions. The instructions included to "get heroin and some cocaine to display on the coffee table to pretend that she was doing drugs with her mom"; "get her fingerprints on everything you used on [sic] hers"; and to take the keys to the house and car and close the door when leaving.

The following day, defendant sent MS another note telling MS not to talk to anyone and to stay the course. Reminding MS of their agreement, defendant wrote "I need my life back and my kids, ok and you a house for your family. Do it clean with drugs. Don't stay." Later in the day he sent a note with more instructions as well as the location of the house keys:

> "when you go to my house, don't park in front until you get the job done . . . . [Then] you can use the left side of my house. You need to turn off the light of the car before you park, ok? And then go in the house. When you get [to] . . . the door I have keys to get in, [they are] on the left side up to your head, ok and you need to make sure that two people [are] there."

Defendant also detailed where MS was to take his children. He wrote that MS should take the children from the house and leave them with defendant's friend. He provided MS with a hand drawn map to the friend's home and a letter that defendant had written to the friend. In the letter, defendant requested that the friend get a babysitter, hide the children, and notify his family that she was caring for them.

Notwithstanding his apparent acceptance of defendant's murder contract, MS never intended to commit the murders. He instead informed the authorities of defendant's plan on the day that defendant recruited MS. MS turned over every note that he received from that day forward and agreed to cooperate with authorities. These notes were admitted into evidence and with consent of counsel, the court provided the notes to the jury at the commencement of deliberations.

On Wednesday, MS was released on bail. Upon his release, he learned from HG that defendant had called her asking for MS to return to jail to visit him. The authorities arranged for the visit at the jail the next day.[3] During this meeting, defendant showed MS a handwritten suicide letter. He instructed MS to force defendant's spouse to transcribe the text of the document in her handwriting so that it appeared as though defendant's spouse had written the letter. Defendant and MS agreed that MS would call the next day to confirm that he had murdered the intended victims. MS testified that he understood the instructions

---

[3] The court excluded as substantially inaudible the recordings and denied the prosecution's request to provide the jury with transcripts of the meeting but permitted MS to testify generally about what he and defendant discussed.

at this meeting and confirmed "that it was on," meaning that MS "was to go through with

. . . [t]he murder of both people."

As agreed, defendant called MS the next morning to confirm the murders. The two

spoke in code as arranged, and, after MS responded to defendant's questions that all was

done as planned, defendant stated, "I'm happy now." Four days later, defendant made an

unannounced call to MS to confirm the murders for a second time.[4]

At the close of the prosecution's case-in-chief, defendant moved to dismiss the

attempted murder counts as legally insufficient. The court denied the motion. Defendant

did not offer any evidence in his defense. After the jury's guilty verdict, defendant moved

to vacate his conviction on the attempt charges on the same insufficiency ground. The court

also denied this motion and imposed concurrent sentences of 17-years-to-life imprisonment

for first-degree attempted murder; 17 years followed by five years' post-release supervision

for second-degree attempted murder; and two-and-one-third to seven-years' incarceration

for criminal solicitation.

On appeal, the Appellate Division reversed the conviction on the attempted murder

counts, concluding the evidence was legally insufficient "to establish [that] the defendant

---

[4] MS knew these calls originated from the jail because of the opening prompt. Both calls were recorded, and the court admitted recordings of the calls into evidence and the prosecution played the calls for the jury. These calls and the initial call to HG were corroborated by notations on defendant's booking card that three calls were placed using his jail number on the telephone across from his cell.

took any action that brought the crime close to completion" (170 AD3d 1508, 1511 [2019]). A Judge of this Court granted the People leave to appeal (33 NY3d 1071 [2019]).

The prosecution asserts that evidence of defendant's conduct was legally sufficient to support the attempted murder counts because he took several steps beyond planning and preparation towards commission of both murders, and the only reason the scheme failed was because the informant intervened. Defendant counters that the Appellate Division's order of modification was not on the law alone but also on the facts as found by the Appellate Division and is therefore unreviewable by this Court. On the merits, defendant argues that defendant's conduct amounted to no more than a solicitation to commit the crime. Defendant maintains that the intended victims were in no immediate danger because neither he nor the informant took any actions beyond planning and preparation to bring the crime close to completion.

In the context of this murder-for-hire, the evidence was sufficient as a matter of law. Defendant both planned the killings and took all necessary steps that, if the circumstances had been as defendant believed them to be, would have resulted in the murders. Contrary to defendant's assertions, the impossibility of achieving the crime based on the informant's lack of intent or action in furtherance of the murders is no obstacle to defendant's conviction for the attempted crimes. The sufficiency of the evidence turns on defendant's conduct, not that of the informant (*see People v Denson*, 26 NY3d 179, 190 [2015] ["Our analysis with respect to whether a defendant has come dangerously near to completing a crime, however, has focused primarily on the conduct of the defendant . . . ."]).

II.

A. Standard of Review

As a threshold matter, contrary to defendant's claim, a determination by the Appellate Division that the trial evidence was legally insufficient to establish guilt, is a determination "deemed to be upon the law," and subject to review by this Court (*see* CPL 470.15 [4] [b]; 450.90 [2] [a]). Our review follows established rules.

A verdict is legally sufficient when, "viewing the evidence in a light most favorable to the People, 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt'" (*Danielson*, 9 NY3d at 349, quoting *People v Acosta*, 80 NY2d 665, 672 [1993]). "This deferential standard is employed because the courts' role on legal sufficiency review is simply to determine whether enough evidence has been presented so that the resulting verdict was lawful" (*Acosta*, 80 NY2d at 672).

B. New York's Law on Attempted Crimes

To meet its burden with respect to an attempted crime, the prosecution must show, beyond a reasonable doubt, that a defendant, "with intent to commit a crime, [] engage[d] in conduct which tends to effect the commission of such crime" (Penal Law § 110.00). As to the counts at issue on this appeal, the court charged the jury on murder in the first degree, in relevant part, as requiring a showing, beyond a reasonable doubt, that

> "[w]ith intent to cause the death of another person, [defendant]
> causes the death of such person or of a third person; and . . .

the defendant committed the killing or procured commission of the killing pursuant to an agreement with a person other than the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement or from a person other than the intended victim acting at the direction of a party to such agreement" (Penal Law § 125.27 [1] [a] [vi]).

The court charged on murder in the second degree as requiring a showing beyond a reasonable doubt that "[w]ith intent to cause the death of another person, [defendant] cause[d] the death of such person or a third person" (Penal Law § 125.25 [1]). Thus, the prosecution had to present sufficient evidence on the first-degree attempted murder counts of a contract to kill his spouse and mother-in-law, and on the second-degree attempted murder counts that defendant acted in concert with another person to kill both intended victims.

The Court has explained that a defendant's actions may constitute an attempt within the meaning of Penal Law § 110.00 when the acts "tend[] to effect the commission" of the intended crime (*Mahboubian*, 74 NY2d at 190, quoting *Rizzo*, 246 NY at 338). That point is reached when such conduct is "'very near' or 'dangerously near' completion" of the crime (*id.*) and has "plac[ed] it in [the defendant's] power to commit the offense unless interrupted, and nothing but such interruption prevented the [] commission of the offense" (*People v Sobieskoda*, 235 NY 411, 419 [1923]; *see also Mahboubian*, 74 NY2d at 191, quoting *Sobieskoda*, 235 NY at 419).

"[B]ad thoughts alone do not constitute a crime" (*Mahboubian*, 74 NY2d at 189). And "the right to think bad thoughts undeterred or unpunished by the criminal law has been

protected by the requirement that in order to be punishable as an attempt, conduct must have passed the stage of mere intent or mere preparation to commit a crime" (*id.* [internal citation omitted]; *accord People v Bracey*, 41 NY2d 296, 300 [1977] ["The law does not punish evil thoughts . . . ."] [citation omitted]).

Critically, however, defendant's act "need not be 'the final one towards the completion of the offense'" (*Mahboubian*, 74 NY2d at 190, quoting *Bracey*, 41 NY2d at 300). Rather, "[t]he necessity of further steps for completion of the crime and the possibility of abandonment or renunciation are factors to be considered in evaluating whether conduct has come 'dangerously close' to success, but are not dispositive" (*id.* at 190-191). Another factor to be weighed is whether the defendant's actions are "potentially and immediately dangerous" (*id.* at 191). "The ultimate issue is whether an individual's intentions and actions, though failing to achieve a manifest and malevolent criminal purpose, constitute a danger to organized society of sufficient magnitude to warrant the imposition of criminal sanctions" (*Dlugash*, 41 NY2d at 725).

"The boundary where preparation ripens into punishable conduct depends greatly on the facts of the particular case" and "differs with different crimes" (*Mahboubian*, 74 NY2d at 190, 191, citing *People v Werblow*, 241 NY 55, 61 [1925]). Thus, our law recognizes an attempt when a "defendant[] may not have been physically within striking distance of success, yet in all but the most literal sense, they were" (*id.* at 192).

In the context of a murder for hire, although the defendant has intentionally distanced themselves from the crime by enlisting another to kill the intended victim, the

defendant may be culpable for an attempt so long as the defendant or the accomplice's conduct tends to effect the commission of the crime. Nothing in our case law suggests otherwise. A defendant does not escape potential criminal liability by enlisting another to assist in commission of the crime because the law recognizes that "what a [person] does by another [the person] does by [themselves]" (*Bush*, 4 Hill at 135; *see also Mahboubian*, 74 NY2d at 191 [finding liability for attempted grand larceny where the defendants hired professional burglars to effectuate a staged theft]).

The rule holds even where the accomplice is an informant and has no criminal intent and performs no overt act in furtherance of the offense. A legal or factual impossibility is no defense. If the conduct in which a person engages would otherwise constitute a criminal attempt within the meaning of Penal Law § 110.00, "it is no defense to a prosecution for such attempt that the crime charged to have been attempted was, under the attendant circumstances, factually or legally impossible of commission, if such crime could have been committed had the attendant circumstances been as such person believed them to be" (Penal Law § 110.10). In other words, a defendant's acts may "come or advance very near to the accomplishment of the intended crime" so long as "the crime itself would have been committed but for timely interference" of the informant (*Rizzo*, 246 NY at 337).

## III.

Here, it is beyond dispute that defendant intended to kill his spouse and mother-in-law, and he chose MS as his instrument in that crime. The only question on appeal is

whether a rational jury could conclude that his actions crossed the line from mere preparation and rendered the crime dangerously close to completion. The jury could.

Defendant took every step necessary to accomplish his goal. Specifically, he provided MS with an incentive, tailored to address MS's impending eviction, by offering him a house in exchange for killing the intended victims; he set the date, time, location and manner of the murders; he provided instructions on where to park the car, how to enter the house, and where to find keys to the house and car so that MS could leave with defendant's children; and defendant drafted and provided MS a letter for the friend who would take care of defendant's children and the template for a suicide note to facilitate his plan.

Defendant never abandoned or vacillated from his plan (*see Mahboubian*, 74 NY2d at 191). He easily could have done so at any time. He could have called off the murders when he met MS in jail or by contacting MS or HG. Instead, he consistently reaffirmed his interest in completing the murders quickly because, as he stated in one of his notes, "I need my life back and my kids." And shortly before the scheduled crimes, he met with MS to ensure MS was ready to follow through with the plan the next day.

The fact that defendant did not provide the drugs to kill the intended victims is not dispositive of his liability for attempted murder as MS never requested that defendant provide the drugs—MS affirmatively indicated that commission of the crime in accordance with defendant's instructions "could be done pretty easily." In other words, the jury could reasonably infer that defendant understood, based on MS's statements, that MS could get the drugs without difficulty and would do so in accordance with the plan. It is unsurprising

that a person who hires someone to commit a crime would expect the hired agent to supply the necessary instrumentality to accomplish the act. All the more so here, where defendant was in custody and unable to obtain the lethal drugs and syringe himself. Our law makes plain that "[t]he law must be practical, and, therefore, considers those acts only as tending to the commission of the crime which are so near to its accomplishment that in all reasonable probability the crime itself would have been committed but for timely interference" (*Rizzo*, 246 NY at 337).

Once defendant provided all the information essential for successful completion of the crimes—answers to the who, where, when, and how, as well as the location of keys to the home and car—defendant, in all but the most literal sense, placed the power to commit the murders in MS's hands. "[T]he overt acts in which [] defendant . . . engaged, in furtherance of the plot to murder [his intended victims], makes it apparent that the contract murder was dangerously near completion, and that [] defendant was merely waiting for confirmation of [their] death[s]" (*People v Sabo*, 179 Misc 2d 396, 403 [Sup Ct, New York County 1998]).

Contrary to the majority's conclusion, defendant committed many acts tending to effect the commission of the crime—in fact the only acts to ensure the murders of his spouse and mother-in-law were defendant's because MS was an informant and never intended to go through with defendant's scheme.[5] The question is not, as the majority

---

[5] Contrary to the majority's assertion (majority op at 9), for purposes of our sufficiency of the evidence review, the sole "contingency" was that MS was a confidential informant and

argues, whether a specific overt act was taken, but rather whether what defendant did was the type of conduct that placed him dangerously close to accomplishing these murders.[6]

Because the point where mere planning ripens into an attempt turns on the underlying crime itself and the facts adduced at trial, there is no bright-line rule to determine when conduct is dangerously near commission of the crime. "'Tending' means to exert activity in a particular direction. Any act in preparation to commit a crime may be said to have a tendency towards its accomplishment" (*Rizzo*, 246 NY at 336-337). Defendant's acts were designed expressly to achieve a singular criminal goal: The murders of his spouse and mother-in-law. "Defendant['s] conduct had plainly 'pass[ed] that point where most

---

never intended to act on any part of the planned murders. That fact was not going to change, regardless of defendant's actions, so consummation of the crimes was impossible. But impossibility is no defense (*see* Penal Law § 110.10). Indeed, all the steps the majority claims defendant did not take were unnecessary since MS had indicated that he would commit the crimes as planned and had everything he needed to accomplish them based on the incentive and information defendant provided.

[6] Contrary to the majority's catalog of supposed deficiencies (majority op at 9-10), the majority cannot point to a single thing that, in fact, *defendant* could have done to bring the crimes closer to completion. Essentially, the majority now requires that law enforcement continue the ruse to "force" a defendant to commit some overt act in the most literal sense. But the majority fails to explain what overt act would necessarily constitute more than mere planning since "even the fact of payment may not, when taken with other facts, be sufficient to satisfy the dangerous-proximity standard" (majority op at 9 n 4), nor does "providing information on how to locate a victim [] necessarily [] cross the line from preparation to attempt" (majority op at 10 n 6). Payment and identification of the intended victim are the only necessary elements of a murder for hire solely within the control of a defendant. So if these are not enough in cases where, as here, defendant is the mastermind of the scheme, what is? Nor does the majority explain how some unknown overt act by defendant would matter to the analysis when the scheme cannot be realized once a confidential informant has interrupted a defendant's plan.

[individuals], holding such an intention as defendant holds, would think better of their conduct and desist'" (*Mahboubian*, 74 NY2d at 191 [citation omitted]).

This Court long ago rejected a "final act" theory of culpability for an attempt. Our precedent recognizes that, requiring intervention perilously close to the completion of the crime, fails to serve the legislative goals of the Penal Law or society's interests in holding accountable those who have come close enough that they should be held criminally liable (*id.* at 190 n 2). Yet, the majority has essentially adopted that standard in murder-for-hire cases where the accomplice is an informant. Our law does not impose such an onerous burden on law enforcement.

Moreover, the majority's conclusion that more is required than the acts taken here risks perverse outcomes. Assume all other facts adduced at defendant's trial except that he paid the informant one dollar in advance; under the majority's view, defendant would be guilty of an attempt. Yet another person harboring the same intent and having contracted to kill on the same terms, but who promises one million dollars upon completion of the murder, is absolved of criminal liability. This is nonsensical. The focus is on the offender's culpability and, under our law, whether a defendant pays up front or promises to pay later, they are liable for an attempt. The Penal Law expressly says so (*see* Penal Law § 125.27 [1] [a] [vi] [providing for liability for first-degree murder where the defendant "procured commission of the killing pursuant to an agreement with a person . . . for the receipt, or *in*

*expectation of the receipt*, of anything of pecuniary value"] [emphasis added]).[7] In fact, the

conduct of an incarcerated defendant who is found guilty of the *completed* crime of first-

degree murder for hire would likely not look much different than defendant's conduct here.

In that sense, the majority's conclusion cannot be squared with our instruction that "the

boundary where preparation ripens into punishable conduct depends greatly on the facts of

the particular case" (*Mahboubian*, 74 NY2d at 190).

The fact that MS never intended to keep his end of this criminal bargain does not

absolve *defendant* of criminal liability for the attempted murders. Under Penal Law §

110.10, impossibility is no defense "if such crime could have been committed had the

attendant circumstances been as such person believed them to be'" (Penal Law § 110.10);

*see also Dlugash*, 41 NY2d at 735; *Moran*, 123 NY at 257 [1890] ["Whenever the (intent)

exists, followed by acts apparently affording a prospect of success, and tending to render

---

[7] The majority's citation to non-binding precedent from a sister high court and an intermediate appellate court from another jurisdiction is misplaced. In *Commonwealth v Hamel* (752 NE2d 808 [Mass App Ct 2001]), The trial court charged the jury that attempt required an "overt act," which the court defined as "some actual, outward, physical action" (*id.* at 815 [emphasis omitted]), whereas our law requires no such physical action to show an attempt (*see Mahboubian*, 74 NY2d at 190 [requiring that an attempt come "very near to the accomplishment of the intended crime"]). *State v Melton* (821 SE2d 424 [NC 2018]), was decided under North Carolina's common-law, criminal-attempt framework, and the court split 4/3 in its conclusion. Unlike here, conspicuously absent in *Hamel* and *Melton* is any agreement on the instrumentality of the murders (*see Hamel*, 752 NE2d at 813 ["(E)xcept insofar as an 'accident' was spoken of, and the parents' house might possibly serve as a locus for killings, there was no scheme"]; *Melton*, 821 SE2d at 436 ["On the subject posed by the 'hitman' regarding how defendant 'wanted it done,' (the) defendant replied, 'I don't care about any details'"]). In other words, the respective defendants' failure to agree on the *method* of the intended crime was a deficiency in the prosecution's evidence. Not so here.

the commission of the crime effectual, the accused brings (themselves) within the letter and intent of the statute"]).

As the Court has explained, "the Legislature substantially carried the Model Penal Code's treatment of impossibility into the 1967 revision of the Penal Law" (*Dlugash*, 41 NY2d at 735). The Code proposed a

> "fundamental change to shift the locus of analysis to the actor's mental frame of reference and away from undue dependence upon external considerations. The basic premise of the code provision is that what was in the actor's own mind should be the standard for determining [the actor's] dangerousness to society and, hence, [the actor's] liability for attempted criminal conduct" (*id.* at 734 [citation omitted]).[8]

The legislature was of "the belief that neither of the two branches of the traditional impossibility arguments detracts from the offender's moral culpability" (*id.* at 735 [citation omitted]; *see also* American Law Institute, Model Penal Code [Tent Draft No. 10], Comments to art 5—Inchoate Crimes, at 5 ["When the actor's failure to commit the substantive offense is due to fortuity, as when . . . the expected response to solicitation is withheld, exculpating the actor would involve inequality of treatment that would shock the

---

[8] Section 5.01 (c) of the Model Penal Code provides that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, [such person] . . . purposely does or omits to do anything which, under the circumstances as [the person] believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in [the] commission of the crime." We have so far declined to adopt the Code's "substantial step" element of criminal attempt given our common law's requirement that a defendant come dangerously close to commission of the completed crime (*see Mahboubian*, 74 NY2d at 191).

common sense of justice. Such a situation is unthinkable in any mature system, designed to serve the proper goals of penal law"]).

Here, as far as defendant knew, MS was fully capable of and intended to kill defendant's spouse and mother-in-law in accordance with defendant's detailed plan, and defendant had provided MS with information both necessary and sufficient to accomplish the murders. MS worked with the authorities to ensure defendant believed that completion of the crimes was underway; all that remained was, on the evening agreed upon, for MS to go to the address provided by defendant, get the keys to the home in the place where defendant said they would be found, enter the home at the time and in the manner defendant had instructed, and kill the persons identified by defendant in accordance with his orders. Under the circumstances, defendant believed nothing remained for him to do but to call MS to confirm the murders. When he made that call, defendant rested assured that MS had performed his end of the bargain. Thus, a rational jury could conclude that "[t]he only reason that an attempt was not made to kill [the intended victims] was because the Informant immediately contacted law enforcement personnel and informed them of the plot" (*Sabo*, 179 Misc 2d at 404). That is, but for MS's deception, two people very well may have been murdered in their home through defendant's efforts.

The majority concludes that the evidence is insufficient because more than a few minor acts remained to accomplish the murders. This view accepts defendant's

counterfactuals. It is nothing less than a weight of the evidence analysis, which is not within

the scope of our review (*Danielson*, 9 NY3d at 348).[9]

Based on the evidence submitted at trial, a rational jury could credit MS's testimony

about defendant's exhaustive scheme. Further, the same jury could infer that the intended

victims would be at the address on the date and time that defendant scheduled the murders,

that MS would have found and used the keys to gain entry in accordance with defendant's

instructions, and that he would have killed the intended victims, if he had not been an

informant. That satisfies our legal sufficiency review, and so our task ends here (*see People

v Gordon*, 23 NY3d 643, 649 [2014], quoting *People v Delamota*, 18 NY3d 107, 113

[2011] ["In considering the evidence we view it 'in the light most favorable to the

prosecution,' and recognize that 'the People are entitled to all reasonable evidentiary

inferences'"]; *Danielson*, 9 NY3d at 349).[10]

---

[9] Unlike the Court of Appeals, the Appellate Division is "empowered to determine whether the verdict is against the *weight* of the evidence" (*id.*, citing CPL 470.15 [5]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Under this standard of review, "the Appellate Division may draw inferences contrary to those implicitly drawn by the jury, and conclude that while legally valid, the verdict should nevertheless be set aside as contrary to the weight of the evidence" (*Acosta*, 80 NY2d at 672). That is, the Appellate Division is empowered to sit as "a thirteenth juror and decide which facts were proven at trial" and the evidence's probity (*Danielson*, 9 NY3d at 348). In contrast, our Court may not weigh the evidence, nor may we "review the Appellate Division's weight of the evidence determination" (*id.* at 349, citing Karger, Powers of the New York Court of Appeals § 21:6, at 75).

[10] We may not ruminate, as the majority does, on whether defendant could have been charged with conspiracy, and, if so charged, whether the trial evidence was sufficient to sustain a conviction (majority op at 9 n 3). The only question before us is whether the evidence of the crimes charged—the attempted murders—was sufficient as a matter of law.

As noted, "[t]he ultimate issue is whether an individual's intentions and actions, though failing to achieve a manifest and malevolent criminal purpose, constitute a danger to organized society of sufficient magnitude to warrant the imposition of criminal sanctions" (*Dlugash*, 41 NY2d at 725). Defendant intended to murder and, at every step of the way, his conduct comported with this intention. "[D]efendant[] may not have been physically within striking distance of success, yet in all but the most literal sense," he was (*Mahboubian*, 74 NY2d at 191).

For these reasons, I would reverse and remit to the Appellate Division for determination of the facts and issues raised (*see Acosta*, 80 NY2d at 672 [remitting for weight of the evidence review], citing CPL 470.40 [2] [b]).

Order, insofar as appealed from, affirmed. Opinion by Judge Feinman. Chief Judge DiFiore and Judges Stein and Wilson concur. Judge Rivera dissents in an opinion in which Judges Fahey and Garcia concur.

Decided November 24, 2020